11-mj- 4125 TSH ~

11-mj- 4178-TSH

## AFFIDAVIT OF BRIAN DEJOY

I, Brian DeJoy, first being duly sworn, depose and state:

## I. INTRODUCTION

1.       I am a Special Agent with the Drug Enforcement Administration ("DEA") of the United States Department of Justice, and have been so employed since 1997. I am currently assigned to the DEA New England Field Division, Financial Investigations Team, in Boston, Massachusetts. During my law enforcement career, I have received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, and the methods used by narcotics traffickers to conceal and launder the proceeds of their narcotics trafficking activities.

2.       In addition to my training, I have had extensive experience in the investigation of the activities of narcotics traffickers. Since joining the DEA, I have participated in more than 150 investigations involving domestic and international drug trafficking organizations as a case agent and in a subsidiary role. I have participated in investigations involving multiple domestic and international jurisdictions including Massachusetts, New York, New Hampshire, New Jersey, Florida, California, Puerto Rico, Colombia, United Kingdom, Panama, Lichtenstein, Switzerland and Venezuela. I have debriefed more than 150 defendants, informants, and witnesses who had personal knowledge about domestic and international narcotics trafficking and money laundering activities. I personally have participated in all aspects of narcotics trafficking investigations, including conducting surveillance, using confidential informants, and conducting court-authorized interceptions of wire and electronic communications.

3.       During the course of my employment with the DEA, I have received specialized training regarding the activities of narcotics traffickers, including their use of various

communication devices such as cell phones, computers, Internet and e-mail accounts. I have also received training regarding the methods used by narcotics traffickers to conceal and launder narcotics proceeds and I have been involved with the investigation of various types of money laundering techniques including bulk cash smuggling and the utilization of shell and front companies by drug trafficking organizations. Based on my training and experience, I am also familiar with the various methods in which narcotics traffickers operating outside the United States launder their drug proceeds internationally.

4.    I am providing this affidavit in support of an application pursuant to 18 U.S.C. § 981(b), 21 U.S.C. § 853(e), 18 U.S.C. § 982(b)(1), and Rule 41 of the Federal Rules of Criminal Procedure and the additional statutory provisions cited below for the seizure of U.S. currency contained in certain bank accounts (collectively "the target accounts") which are further described in the remainder of this affidavit and in **Attachment A**. There is probable cause to believe that the funds in the target account, as described in Attachment A, are subject to seizure and forfeiture to the United States of America on the grounds set forth below.

(a)    The target accounts and the funds contained in them as described in Attachment A have been used, and are currently being used, to launder monetary instruments, domestically and internationally, and to conduct and attempt to conduct financial and monetary transactions in violation of one or more of the following:

(i)    18 U.S.C. § 1956(a)(1)(A)(i) (laundering to promote specified unlawful activity);

(ii)    18 U.S.C. § 1956(a)(1)(B)(i) (laundering designed to conceal);

(iii)    18 U.S.C. § 1956(a)(2)(A) (international laundering to promote specified unlawful activity);

(iv)   18 U.S.C. § 1956(a)(2)(B)(i) (international laundering designed to conceal);

(v)   1956(a)(3)(B) (the "sting" laundering provision);

(vi)   18 U.S.C. § 1957 (unlawful monetary transactions over $10,000); and

(vii)   18 U.S.C. § 1956(h) (money laundering conspiracy).

Therefore, the target accounts, and the funds contained in them as described in Attachment A, constitute property, real or personal, involved in a transaction or attempted transaction in violation of Sections 1956 and 1957, or property traceable to such property and are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1) and/or 18 U.S.C. § 982(a)(1);

(b)   The target accounts contain, and have contained, funds as described in Attachment A that constitute or are derived from proceeds traceable to offenses constituting "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), incorporating 18 U.S.C. § 1961(1), including the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, punishable under any law of the United States, and conspiracies to commit such offenses. All such property, real or personal, which constitutes or is derived from proceeds traceable to such violations are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

(c)   The target accounts contain, and have contained, funds as described in Attachment A that constitute moneys, negotiable instruments, securities, and other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substances Act, or proceeds traceable to such an exchange or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of the Controlled Substances Act. Therefore, the funds in the target accounts as described in Attachment A are

forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6) and/or 21 U.S.C. § 853(a).

(d)     Several of the offenses described in paragraphs 4(a) through (c) above constitute continuing offenses that are still ongoing. However, to the extent that any of the listed offenses were completed within one year before the seizure sought by this application, it shall not be a defense to forfeiture that the funds currently deposited in the target accounts are not the same funds that were involved in those completed offenses. Pursuant to 18 U.S.C. § 984, the funds currently on deposit in the target accounts as described in Attachment A are forfeitable to the United States as fungible property in lieu of the funds that were so involved.

5.     The information contained in this affidavit is based on an ongoing DEA and Internal Revenue Service ("IRS") investigation into a drug smuggling and money laundering organization that has been using bank accounts both in the United States and outside the United States to facilitate the laundering of illegal drug proceeds in United States currency picked up from the streets of the United States and elsewhere, as more fully described below. My statements herein are based upon my personal participation in this investigation, which has included interviews with and analysis of reports submitted by Special Agents and Task Force Officers ("TFO") of the DEA and IRS, and other law enforcement personnel assigned to the DEA Financial Investigations Group and IRS working on this investigation; reviews of translated transcripts of lawfully intercepted telephone conversations from wiretaps being conducted in Colombia by the Colombian National Police ("CNP"); Internet communications among the targets of the investigation and between the targets of the investigation and undercover agents; meetings with foreign law enforcement officers, including CNP officers, assisting the investigation; reviews of emails seized pursuant to federal search warrants; and reviews of financial and bank account records and records of wire transfers. I am familiar with all aspects of

- 4 -

this investigation.  The information set forth in this affidavit is based on this familiarity, on

information which I have reviewed and determined to be reliable, and on my training and

experience investigating narcotics and money laundering organizations. Since this affidavit is

being submitted for the limited purpose of seeking authorization for warrants to seize the funds

on deposit in the target accounts, I have not set forth each and every fact learned during the

course of this investigation.  All references to dates and times are approximate.

## II. OVERVIEW OF INVESTIGATION

### A    The Undercover Money Laundering Investigation

6.    Since 2005, ███████████████████████████████████

███████ has been acting in an undercover capacity as a money launderer based in Massachusetts.

Beginning in May 2007, ███████████ began infiltrating a network of money launderers/money

brokers in Venezuela and Colombia through the assistance of a DEA confidential source in

Venezuela ("CS-1").  In June 2007, ████████████(hereinafter "UC-1") began negotiating directly

with **CARLOS ORLANDO ZAMBRANO-BRICEÑO**, a Venezuelan money launderer/broker,

to pick up  and launder large sums of money in New York City.  In exchange for a percentage

commission, CS-1 told ZAMBRANO that his associate in the United States ("UC-1") could pick

up the money and wire it from UC-1's bank accounts (a series of DEA undercover bank accounts

in Massachusetts) to other bank accounts at ZAMBRANO's direction.

7.    The investigation, which began in early 2007 and is still ongoing, has uncovered

an elaborate money laundering operation involving a network of other conspirators located in

Venezuela, Colombia, and elsewhere who have used the target accounts, among other bank

accounts, to launder tens of millions of U.S. dollars in drug trafficking proceeds in the United

States and elsewhere back to the source of supply for cocaine in Colombia.  In general terms, the

operation works as follows:

      a.     The conspirators are members of, or work for, a drug trafficking organization based in Medellín, Colombia, known as *La Oficina de Envigado* (the "Colombian Cartel"). The Colombian Cartel imports illegal narcotics into the United States and Europe for further distribution. After the narcotics are distributed in the United States and elsewhere, the Colombian Cartel needs to collect and launder the proceeds generated by the sale of the narcotics.

      b.     The conspirators include "money brokers" based in Colombia and Venezuela who enter into arrangements or "contracts" with the Colombian Cartel to take physical possession of the cash generated and collected from drug sales in the United States and Europe that the Colombian Cartel needs to be picked up off the street and placed into, and passed through, the United States financial or banking system. The brokers arrange to have couriers deliver the drug proceeds to money launderers working for or with the brokers. Often, the Colombian Cartel compensates the brokers by paying them a percentage of the amount of drug proceeds that are laundered.

      c.     As further detailed in **Attachment B**, on at least fifty-nine (59) occasions, between May 2007 and May 2011, the conspirators have caused money couriers to deliver for laundering large amounts of United States currency, and on a few occasions, currency in Euros, all of which I have probable cause to believe constituted drug proceeds. Thus far, the deliveries of drug proceeds have taken place in the District of Massachusetts in Boston, Woburn, Revere and Somerville; in several other U.S. cities including New York City, Philadelphia, Los Angeles, Houston, Chicago, and San Juan; and several locations outside the United States, including Guatemala, Mexico, Sint Maarten, and Italy. The deliveries of drug proceeds were made to

persons holding themselves out to be professional money launderers, but who, in reality, were undercover law enforcement agents ("UC agents") working with the DEA or foreign law enforcement agencies. The UC agents accepted delivery, or picked up, the drug proceeds at the direction of the brokers, transferred the drug proceeds into undercover bank accounts controlled by the DEA in both New York and Massachusetts, and then wire-transferred the drug proceeds into accounts designated by the brokers, including the target accounts herein that are the subject of this warrant application.

    d.    As part of the investigation, the DEA set up undercover bank accounts in the District of Massachusetts and the Southern District of New York to receive the drug proceeds and, following the instructions from the brokers, to wire the drug proceeds to other bank accounts both inside and outside the United States.

    e.    The broker-conspirators contacted UC-1 and gave him telephone numbers and "safe codes" to be used during the pick up of drug proceeds. UC-1 and other UC agents used these codes and contact information to contact the money couriers, arrange for the pick up of drug proceeds, and, finally, to actually pick up the drug proceeds. The broker-conspirators paid the UC agents a commission for their laundering services, usually between five percent (4%) to eight percent (10%) of the amount of currency picked up.

    f.    There is probable cause that the large amounts of currency that the the conspirators arranged to deliver to undercover agents involved in the DEA undercover money laundering operation (the "UC Operation") were in fact drug proceeds. First, the manner in which these transfers of large amounts of currency took place had many indicia of drug trafficking. The physical transfer of the drug proceeds to UC agents from the money couriers

generally occurred in public places such as busy streets or parking lots. At times, the money

couriers delivering the money retrieved it from electronic hidden compartments in their vehicles.

The currency was also often contained in heat-sealed bags and/or contained materials, like dryer

sheets or scented towels, designed to mask any narcotic odor on the currency. Second, on

multiple occasions, UC-1 and other UC agents have had recorded conversations with the targets

of the investigation about purchasing large quantities of cocaine and/or heroin from the targets

and how the money being delivered was "clean" from any narcotic odor. Most recently, in

February 2011, the DEA made a controlled purchase of a "sample" kilogram of cocaine in

Colombia from one of the primary targets of the investigation. Third, on at least two occasions,

in Texas and in Rome, Italy, law enforcement agents made seizures of cocaine in connection with

the organizations making the deliveries of currency to the UC Operation. On at least one

occasion, during a transaction in Rome, Italy, the drug proceeds had visible traces of cocaine

powder.

       g.    Upon delivery of drug proceeds to the UC agents, the broker conspirators

provided wire transfer instructions to UC-1. The conspirators often emailed the wire transfer

instructions from their respective email addresses to UC-1's undercover email address. Although

the ultimate destination of the drug money was Colombia, where *La Oficina de Envigado* is

based, the conspirators typically instructed UC-1 to wire the money from UC-1's Massachusetts

bank accounts to financial institutions in the United States, Panama, the Carribean, Portugal and

China. During these transactions, UC-1 had multiple communications with the broker

conspirators and their criminal associates in recorded telephone calls, emails, MSN Instant

Messages, and Blackberry Pin-to-Pin communications about the pick ups, the transportation of

the money, and the ultimate transfer of the money from UC-1's accounts to destinations identified by the brokers. For the most part, each of UC-1's pertinent telephone calls and other communications to and from the broker conspirators were conducted while UC-1 was in Massachusetts. Once UC-1 completed each of the wire transfers, UC-1 generally emailed the money brokers confirmation of the wire transfers which identified the banks from which UC-1 was sending the money as being located in Massachusetts or, on a few occaasions, from New York City.

8.      The undercover money laundering operation, the UC Operation, began with picking up large sums of drug money in New York City for CARLOS ZAMBRANO. Between May and September 2007, at ZAMBRANO's direction, UC-1 and other undercover ("UC") agents picked up more than $1.5 million in cash in New York City and wire transferred the money to series of accounts at Bank of America ("BOA") that were each listed under a variation of the name "Rosemont Corporation." Each of these "Rosemont" accounts at BOA were also in the name of, and controlled by, various *casa de bolsas* (exchange houses, more fully described below) in Venezuela that the DEA later seized in March 2009.

9.      In early 2008, ZAMBRANO introduced UC-1 to a group of other money launderers brokers/brokers, including **JOHAN LEONARDO JAUREGUI VARGAS** and **ALDO FERNANDO GUERRERO CLAVIJO, a.k.a. "Rolo."** The investigation has revealed that both JAUREGUI and GUERRERO are directly involved in the importation of cocaine into the United States and Europe and that GUERRERO works directly for a drug cartel based in Medellín, Colombia known as *"la Oficina de Envigado."* In January and March 2008, ZAMBRANO, GUERRERO, and JAUREGUI directed UC-1 to pick up  approximately $2

million in Guatemala. During one internet Instant Messenger ("IM chat") conversation,
GUERRERO informed UC-1 that he was in charge of these operations: "*every card* (dollar) *in
Guate* (Guatemala) *or in the DF* (Districto Federal, Mexico) *are mine, they are only the buyers*
(on the black market currency exchange).

10.     In June 2008, another money laundering broker to whom ZAMBRANO
introduced UC-1, **JOSE ALBERTO CARMONA-COLMENARES**, arranged for UC-1 to pick
up drug money in Italy. On June 5, 2008, two Italian men, Roberto Panichi and Alessandro
Aquila delivered 200,000 Euros to a female UC agent with the Italian National Police
("INP")(*Polizia di Stato*) at a hotel in Rome. Following this undercover pick up , ZAMBRANO
directed UC-1 to wire transfer the money to an account in Portugal. After this undercover pick
up  on June 5, 2008, the INP initiated a wiretap investigation that on May 4, 2010, resulted in the
seizure of 225 kilograms of cocaine that was sent from Colombia through the Dominican
Republic to Panichi, Aqulia and others in Italy.

11.     On March 25, 2009, the DEA executed fifty-nine (59) seizure warrants for the
"Rosemont Accounts" at BOA which resulted in the seizure of $151,309,026.39. This seizure
was widely publicized in Venezulea, and contributed to ultimate demise the bond swap
(*"permuta"*) market in Venezuela, which is now illegal in Venezuela. As a result, the DEA only
conducted one UC transaction with the targets of the investigation, in Puerto Rico in April 2009.

12.     In April 2009, GUERRERO contacted UC-1 about doing a pick up of $575,000 in
drug proceeds in Puerto Rico. Thereafter, between April and June 2009, UC-1 had multiple
recorded conversations with a then unidentified male "Viejo" (later identified as **JUAN
CARLOS GUADALUPE**) about picking up the money in Puerto Rico. Several of these

- 10 -

conversations took place while UC-1 was in Massachusetts and during one call, UC-1 specifically informed GUADALUPE that he was in Lynn, Massachusetts.  On June 2, 2009, GUADALUPE delivered $575,125 in drug proceeds to UC-1 in Puerto Rico.  During the recorded conversation that proceeded the delivery, GUADALUPE talked to UC-1 about contracts to pick up money from the sale of "furniture" (cocaine) in both Puerto Rico and New York. GUADALUPE said that he had "3 large ones" ($3 million) that needed to be picked up in New York, and told UC-1 that the was the owner of "the stuff" (the cocaine) in both Puerto Rico and New York.

13.    After receiving the money from GUADALUPE, GUERRERO again directed UC-1 to wire transfer the money to the same account in Portugal.  The money was first brought to Massachusetts and sent to Portugal through an undercover bank account in Massachusetts. Based on information obtained from email search warrants and ongoing wiretaps that are being conducted by members of the Colombian National Police ("CNP"), after the money was transferred to the Portugal account, **EDUARDO PABUENCE** caused this money to be paid out in Venezuelan Bolivars at a *casa de bolsa* in Venezuela, and one of the recipients of this money was **JAIME TORRES-RODRIGUEZ.**  These Colombian wire intercepts also revealed that the account in Portugal was controlled by a Venezuelan national living in Spain and Portugal, PABUENCE, and that PABUENCE along with **WILSON ORLANDO SERNA-HOYOS, a.k.a. "El Mono"** and GUERRERO were involved in the laundering of drug proceeds through the now defunct Venezuelan bond market (the *permuta).*

14.    In August 2009, UC-1 arranged for one of his associates (another UC agent, UC-2) to meet with GUERRERO's associate from the organization in Medellin, *la Oficnia de*

*Enviagado*, to purchase cocaine.  Thereafter, on August 27, 2009, ███████████████

("UC-2") had a recorded meeting with three Colombian males at the food court of a mall in

Bogotá.  During the meeting, a male referred to as "La Erre" (who was later identified as

**RIGOBERTO MURIEL-TORRES**) informed UC-2 that they had large quantities of cocaine

available for distribution in Guatemala that would be brought to Puerto Rico, but that distribution

of that cocaine directly to New York would be difficult.  Later in the investigation, in April and

May 2011, GUERRERO offered UC-1 300 kilograms of cocaine for sale that are currently in

Mexico City that according GUERRERO, and confirmed by Colombian wiretaps, are being

controlled by MURIEL.

15.     Beginning in early 2010, and continuing until the present time, the DEA has

engaged in numerous undercover money pick up  operations across the United States in New

York City, Chicago, Atlanta, Los Angeles, Houston, and New Jersey as well as in Massachusetts

in the cites of Woburn, Somerville, Revere, and Boston.  The undercover pick ups of drug money

and the subsequent wire transfers that the DEA executed to the target accounts and other

accounts, following the speficic instructions from the targets of the investigation, are further

described in detail in **Attachment B.**  The bank accounts that are the subject of this search

warrant application are a substantial portion of the bank accounts which GUERRERO, and the

other targets of investigation, provided to UC-1 in order to launder the drug money that the UC

Operation picked up in different cities in the United States including cities in Massachusetts in

2010 and 2011.

16.     In January 2010, GUERRERO contacted UC-1 about picking up money in the

Houston, Texas area.  Thereafter, on January 13, 2010, January 25, 2010, and February 24, 2010,

- 12 -

UC agents in Houston picked up a total of more than $1.1 million in drug money from couriers that, per GUERRERO's instructions, were wire transferred to accounts in the names of several businesses in Florida ████████████████████████████████████████ ████████████████████████████████████ A financial investigation later revealed that the money from some of these transactions was laundered on the Black Market Peso Exchange ("BMPE") and the DEA later seized six of these bank accounts.

17.     During the first pick up of drug proceeds in Houston on January 13, 2010, the CNP intercepted several phones calls between GUERRERO and another male in Colombia referred to as "Primo" who was later identified as **WYLLSEYN MARQUEZ-GOMEZ**. During these calls GOMEZ and GUERRERO talked about the money that was picked up in Houston and how the bank accounts that MARQUEZ provided were insufficient to hold all the money that needed to be laundered. In May 2010, GUERRERO also had several recorded communications with UC-1 about the availability of hundreds of kilograms of cocaine available for sale in Texas. Shortly after this, on May 20, 2010, Coast Guard and Department of Homeland Security agents seized 238 kilograms of cocaine off a vessel off the coast of Corpus Christi, Texas. In later recorded communications, GUERRERO confirmed that this shipment of cocaine that was seized was the one that he was expecting.

18.     On February 26, 2010, another UC agent working with UC-1 ████████ ████████ "UC-3") met with JAUREGUI in Sint Maarten about laundering $300,000 for JAUREGUI. During this meeting, UC-3 also met with the purported owner of the drug money that needed laundering, **DANIEL OSORIO GARCIA**. During this meeting, which was recorded, JAUREGUI told UC-3 that the arrival of the money was delayed because it was being

- 13 -

transported by commercial boat, that it was wet and had a strong odor.  In the same meeting, in

OSORIO's presence, JAUREGUI talked to UC-3 about different cocaine trafficking ventures,

including a new commercial airline route to the United States from Peru.  On March 11, 2010,

UC-3 again met with JAUREGUI and took possession of $179,000 in cash.  After the delivery of

cash, JAUREGUI had further discussions with UC-3 about other money laundering operations

and cocaine trafficking opportunities.  Following JAUREGUI's instructions that UC-1 received

via email, the DEA wire transferred the funds (minus the DEA's commission) to an account in

Panama.  Later that year, in August 2010, UC-1 met with JAUREGUI in Amsterdam.  Although

the meeting was not recorded (because of local legal requirements), UC-1 spoke with

JAUREGUI at length about his ongoing money laundering and drug trafficking activities.

19.     Beginning in April 2010, the UC Operation began picking up drug money in Los

Angeles, California.  Following these pick up s, GUERRERO instructed UC-1 to wire more than

$918,000 of this drug money to accounts in the United States at Wachovia, Citibank, and

Deutsche Bank under the names of two different exchange houses in Bogotá, Colombia,

*Professionales Casa De Bolsa* and *Corredores Asociados*.  The investigation would later reveal,

through an undercover meetings in Bogotá, Colombia in 2011, that a trader/broker associated

with these two *casa de bolsas* in Bogotá, **ANDRES COVELLI CADAVID, a.k.a. "Don

Andres,"** provided these accounts to GUERRERO and who, according to GUERRERO, is a

"person of confidence" for the organization who launders money for GUERRERO and the

organization in Medellin.  Thereafter in June and July 2010, the UC Operation picked up a total

of more than $1.3 million in the Bronx in the New York City and Long Island New York for

GUERRERO.  Following three of these pick up s, GUERRERO directed UC-1 to wire transfer

the funds to an account at Deutsche Bank and Trust under the name **Professionales Casa De Bolsa**, which is another account that COVELLI provided.

20.     In July, August and September 2010, GUERRERO contacted UC-1 about picking up money in Chicago, which GUERRERO and others referred to as "*la rueda*." During these transactions, GUERRERO informed UC-1 that the drug money in Chicago belonged to a new client that GUERRERO referred to as "*la Salsa*," slang for a person from Cali, Colombia, and whom who the CNP later identified through surveillance and intercepted calls as **FREDDY FRANCISCO CAICEDO.** For example, during an intercepted call on August 31, 2010, CAICEDO talked to GUERRERO about how the guys holding the money in *"la rueda"* were not answering the phone and told GUERRERO that they needed to make a "deposit" tomorrow. CAICEDO also complained to GUERRERO that "Camilo" (**JUAN CARLOS GOMEZ-PRECIADO**) had left him "without a fuckin peso" from the last transaction. Months later, on March 2, 2011, following a pick up of $100,000 in drug money in Woburn, Massachusetts, UC-1 had a recorded three way phone call with CAICEDO in which CAICEDO confirmed that he was involved in causing the delivery of the $100,000 in Woburn.

21.     On December 11, 2010, UC-1 engaged in a recorded undercover meeting with GUERRERO and a male later identified as JUAN CARLOS GOMEZ-PRECIADO, a.k.a. "Camilo" at a hotel in Bogotá, Colombia. During the recorded meeting, UC- had detailed discussions about GUERRERO and UC-1's previous money laundering transactions, including those also involving GOMEZ, and talked about the possibility of one of UC-1's associates, UC-2, purchasing between 500 and 1,000 kilograms of cocaine in Colombia for importation into the United States.

22.     On January 21, 2011, UC-1 together with the same DEA confidential source described above ("CS-1"), who was posing as UC-1's South American banking consultant, engaged in a recorded undercover meeting with GUERRERO, ALAVRO ARTEAGA, a.k.a. "Pastuso," and a third individual then known as "Don Andres" who was later identified as ANDRES CADVID COVELLI.  Prior to the meeting, UC-1 asked GUERRERO about using the accounts at the casa de bolsas in Colombia (*Cia De Profesionales De Bolsa* and *Corredores Associados S.A.*) to launder money for one of UC-1's drug trafficking clients.  GUERRERO agreed and arranged a meeting to introduce UC-1 to "Don Andres."  During the meeting, "Don Andres" (COVELLI) told UC-1 about the various ways that he could "monetize" the drug money that UC-1 would provide him.  In particular, COVELLI described how he uses the accounts at the casa de bolsas at *Profesionales* and *Corredores* to receive large sums of U.S. dollars in the United States, and payout the money in Colombia in Colombian pesos through various companies COVELLI said he manages in Colombia.  COVELLI also said that people within the *casa de bolsas* had instructed him, because of the US Patriot Act, to ensure that the incoming wire transfers were under $100,000 in order to avoid scrutiny from U.S. law enforcement and bank regulators.  During the same meeting, in front of COVELLI, UC-1 again talked to GUERRERO and ARTEAGA about purchasing cocaine.  Before doing so, however, GUERRERO assured UC-1 that UC-1 could talk openly about drug trafficking because COVELLI was "a person of confidence."

23.     Thereafter, on February 23, 2011, UC-1 arranged for GUERRERO and GOMEZ to deliver a "sample" of a kilogram of cocaine to another DEA Confidential Source ("CS-2") in Bogotá.  During the brief meeting, GUERRERO and GOMEZ were videotaped delivering a

- 16 -

kilogram of white powder that was later analyzed by the DEA in New York City and found to contain cocaine. More recently, in April and May, 2011, UC-1 has engaged in recorded conversations and negotiations with GUERRERO about purchasing 500 kilograms of cocaine from a laboratory around Medellin, Colombia and about purchasing 300 kilograms of cocaine that are currently located in Mexico City, Mexico.

24.     On May 12, 2011, a grand jury sitting in the District of Massachusetts returned a sealed indictment charging (1) ALDO FERNANDO GUERRERO CLAVIJO, a.k.a. Carlos Fernando Guerrero C, a.k.a. "Zeus," a.k.a. "Rolo" (2). NELSON ALVARO ARTEAGA-ESPINOZA, a.k.a. "Pastuso" (3) JUAN CARLOS GOMEZ-PRECIADO, a.k.a. "Camilo" (4) ANDRES CADVID COVELLI, a.k.a. "Don Andres," a.k.a. Andres Torres Landines, (5) JOHAN LEONARDO JAUREGUI VARGAS, a.k.a. Jhojan Jauregui Frias, a.k.a. "Leo" (6) CARLOS ORLANDO ZAMBRANO-BRICEÑO, a.k.a. "Ajigbotifa Agunsola" (7) JOSE ALBERTO CARMONA COLMENARES, (8) EDUARDO PABUENCE, a.k.a. Eduardo Vene, (9) WILSON ORLANDO SERNA-HOYOS, a.k.a. "El Mono" (10) PEDRO JOSÉ AMADO MONTILLA, a.k.a. "El Viejo" (11) JAIME TORRES-RODRIGUEZ, (12) WYLLSEYN MARQUEZ-GOMEZ, (13) FREDDY FRANCISCO CAICEDO, (14) GUILLERMO VILLEGAS ZULUAGA, a.k.a. "Memo" (15) JUAN CARLOS GUADALUPE-NUNEZ, a.k.a. "El Viejo" (16) DANIEL OSORIO GARCIA, (17) JULISSA PEREZ, (18) HENDERSON MARTINEZ, a.k.a. "Juan" (19) ROBERTO TORRES-COLON, a.k.a. "Chappa" with, among other money laundering, conspiracy to launder monetary instruments in violation of 18 U.S.C. § 1956(h) in criminal case 11-cr-10187-PBS. The indictment also charges GUERRERO, ARTEAGA, and a third defendant, RIGOBERTO MURIEL-TORRES, a.k.a. "la Erre" with conspiracy to import

- 17 -

cocaine into the United States and to manufacture and distribute cocaine for unlawful importation into the United States in violation of 21 U.S.C. § 963.

**B.      The Black Market Peso Exchange**

25.      Based on my training and experience, and the experience of other law enforcement agents, I am generally familiar with what is known as the Black Market Peso Exchange ("BMPE"). As further described below, a number of the bank accounts described herein - for the most part, accounts in the name of smaller sized businesses in South Florida that import and export goods to and from South America - have been used to launder drug money on the BMPE. The BMPE is a trade-based money laundering scheme used by Colombian narcotics traffickers to facilitate a non-regulated exchange of United States dollars ("USD" or "dollars") for Colombian pesos ("COP"). In general terms, the BMPE operates as follows:

a.      Colombian drug traffickers hold large quantities of narcotics proceeds in USD that they need to convert into their local currency for use in Colombia. At the same time, Colombian and other South American businesses are in need of USD to pay for "imported" goods or services and often seek dollars on the BMPE so they can avoid government scrutiny - including import duties, sales taxes, and income taxes - and obtain or "purchase" USD at a more favorable exchange rate than the official market rate. For example, all USD payments for goods imported into Colombia on the formal exchange market are supposed to be reported to the Central Bank of Colombia, the *Banco de República,* and the Colombian customs and taxing authority, the *Direccion de Impuestos y Aduanas Nacionales* ("DIAN"). Nevertheless, many Colombian businesses do not pay for imports using the formal exchange system, but instead purchase USD from money brokers on the BMPE market. A significant source of these dollars

for these transactions is drug proceeds.

b.      In a typical BMPE currency exchange transaction, a BMPE money broker arranges with a Colombian drug trafficker or their representative to "purchase" USD from the drug trafficker. The BMPE broker agrees to purchase dollars from the drug trafficker with Colombian pesos at a heavily discounted exchange rate. The BMPE broker then finds Colombian or other South American customers - usually businesses that need dollars to pay for imports or other foreign services - and sells the Colombian or South American customers the USD and the right to use those dollars, including the actual wire transfer of those dollars that are on deposit in a U.S. bank account. The BMPE broker negotiates a dollar/peso exchange rate lower than the formal currency exchange market rates, but higher than what the broker paid for the dollars from the drug trafficker on the black market. While the BMPE broker does not explicitly represent the source of the dollars to be drug proceeds, the fact that these United States dollars are from the proceeds of narcotics trafficking is common knowledge in Colombia and elsewhere in Latin America and Carribean countries that export goods to Colombia.

c.      The Colombian and South American customers inform the broker where the "purchased" dollars need to be delivered, usually by means of wire transfer. Typically this is done by providing the money broker and, in turn, drug trafficking organization, via facsimile or email, wiring instructions for a particular bank account in the United States. In many cases, the money broker will provide the drug trafficker a printed list of wire transfer instructions for various United States banks and companies with the dollar amount for each wire transfers handwritten on the document. In this way, the actual movement of drug dollars is divided into multiple wire transfers to various bank accounts in smaller dollar amounts in order to conceal the

illicit nature of the funds. The dollars transferred into the accounts are drug proceeds, but are used to pay for goods or services on behalf of the broker's Colombian and South American customers. Thus, a typical indication of a BMPE arrangement occurs when a United States based company exports goods or services to an entity in Colombia, but receives payment for those goods or services from a third party, unrelated to the underlying transaction. The transaction is also often masked as the repayment of a "loan" from the third party in order conceal the illicit nature of the transaction.

   d.  Once the transfer is executed, the broker gives his Colombian or South American customers proof the dollars were sent, usually by emailing copies of the wire transfer confirmations, and pays the broker Colombian pesos at the previously negotiated exchange rate. The broker, in turn, transfers the pesos he receives from his customers to the drug trafficker that sold him the dollars and the broker retains the profit he made on the difference in the exchange rates.

## C.  The Illegal Structuring of Funds

   26.  In addition to undercover wire transfers of drug money into the target accounts, an analysis of bank records have revealed that some of the accounts that the targets of the investigation have used to launder drug money also have deposits of cash that were deposited in a "structured" manner. Under the Bank Secrecy Act ("BSA"), 31 U.S.C. §§ 5311-5330, domestic financial institutions are required to report currency transactions which involve the payment, receipt, or transfer of United States coins or currency in the amount of $10,000 or more. The report must be made on a IRS Form 4789, commonly called a "Currency Transaction Report" ("CTR"), and requires the domestic financial institution, among other things, to verify the

identity of the individual who conducted the transaction and the individual or organization for whom the transaction was completed. The CTR's are required to be filed with the IRS to assist the government in criminal, tax, and regulatory investigations and proceedings, as stated in 31 C.F.R. §§103.15, 103.22, and 103.27.

27.     Illicit funds generated from drug trafficking in the United States are often introduced into the United States financial system through "structured" deposits of cash. The term "structuring" refers to a technique money launderers commonly use to conduct cash transactions in a manner to circumvent federal record keeping and/or reporting requirements under the BSA described above including the filing of a CTR which would require the bank to verify the identity of the individual depositor and report detailed information about the transaction to the IRS.

28.     Under a typical structuring scheme, a single individual or team of individuals called "smurfs" acting in conjunction with a money laundering organization, will make multiple deposits of cash, usually at different branches of the same bank, in round dollar amounts, but in each case, less than $10,000, to purposely avoid having the bank file a CTR and report the transaction to the IRS.

**D.     Casa de Bolsas/Exchange Houses**

29.     Based on my training and experience, the experience of other law enforcement agents with whom I work, and the facts of this investigation, I am basically familiar with *"casa de bolsas." Casa de bolsas,* also known as exchange houses, are private financial institutions that generally provide brokerage and other investment services as well as currency exchange services that regulated.

30.     During the investigation, the DEA has often been directed to transfer large sums of drug money into accounts in the United States held in the name of *casa de bolsas* (Exchange Houses) in Colombia and Venezuela.  Some of the target accounts have also been recipient of large numbers of wire transfers from *casa de bolsas* type institutions in Mexico known as *casa de cambios*.  The transfer of these large sums of drug proceeds in U.S. dollars into accounts in the United States through foreign *casa de bolsas* have permitted the targets of the investigation to disguise incoming wire transfers of drug money as legitimate investments and transactions.  The structure of these transactions, where U.S. dollars are wired into *casa de bolsa* accounts in the United States, but paid out in local currency through accounts in Venezuela and Colombia make it difficult, if not impossible, for U.S. financial institutions, regulators, and law enforcement to ascertain the actual participants in the transactions and the ultimate disposition of the funds.

**E.     The Permuta Process**

31.     During the investigation, the DEA wired millions of dollars of drug proceeds that were laundered through Venezuela *casa de bolsas* through the Venezuela *"permuta"* market.  The *permuta* involved the exchanging or "swapping" of bonds and until approximately May 2010, was the most common method utilized in Venezuela to convert U.S. dollars into *Bolívars*, and likewise to convert *Bolívars* to U.S. dollars.  The *permuta* market has been characterized as a "parallel market" that has arose as the result of currency exchange restrictions in Venezuela.

32.     The Venezuelan government strictly controls the exchange of U.S. dollars and Venezuelan *Bolívars*.  In order to legally obtain U.S. dollars with *Bolívars* in Venezuela, individuals and businesses must apply to the Venezuelan government, through an entity known as *CADIVI* in Finance Ministry (*Comisión de Administración de Divisas*)(the Exchange

- 22 -

Administration Board). The *CADIVI* process, however, has been described as burdensome and time consuming. The *permuta* market operated outside these currency restrictions in a "parallel market" that utilized banks accounts in the United States and offshore accounts in Panama and the Caribbean to conduct the actual "swap" of bonds. In May 2010, the government in Venezuela outlawed the *permuta* bond swap process and cited concerns about illicit money laundering following the DEA's seizure of more than $151 million from the Rosemont account in March 2009.

### III. OVERVIEW OF THE TARGET ACCOUNTS

33.     As further described herein, during the ongoing UC Operation, the DEA has wire transferred tens of millions of U.S. dollars into numerous bank accounts in the United States and elsewhere at the direction of the targets of the investigation. Following each undercover money laundering transaction, financial investigators from the DEA, IRS, and the U.S. Attorney's Office involved in this investigation issued grand jury subpoenas for each of the bank accounts into which the DEA wired drug money and analyzed these bank records and investigated possible connections among the individuals and accounts that the targets of the investigation used to launder drug money.

34.     The bank accounts named in this affidavit are divided into three categories. In the first category of accounts, the government is seeking to seize all the funds on deposit in the target account. As to these accounts, there is probable cause to believe that these accounts are being as part of an ongoing system, utilized by a network of co-conspirators, to launder drug money from the United States to Venezuela and Colombia. As further described in Attachment A to each of the individual warrants for these accounts, the government is seeking the seizure of not only all

funds in the account at the time of the execution of the warrant, but also the seizure of all other funds credited to the account within a ten day period because, as indicated herein, there is probable cause to believe that these particular accounts are being used to launder drug money on a continuing and regular basis.   In the second category of accounts, the government is seeking to seize the specific amount of drug money that the DEA wired into the bank account within the past year.   Finally, the third category of accounts are bank accounts located at Banesco Bank in Panama for which the government is seeking to seize all the funds on deposit.   The warrants for these accounts in Panama will be transmitted to Panama through a Mutual Legal Assistant Treaty request to law enforcement officials in Panama.

A.   **Bank Accounts For Which the Seizure of All Funds on Deposit in the Target Account is Sought**

    1.   **CITIBANK NA Account Number** ▮▮▮▮▮▮ **in the name of CORREDORES ASOCIADOS S.A. ("CITI-4795")**

35.   CITI-4795 is an account at CITIBANK in New York and was opened on November 19, 2004. CITI-4795 is in the name of *Corredores Associados S.A.*, an exchange house located in Colombia whose full name is *Corredores Associados S.A. Comisionista de Bolsa,* with offices in Bogota, Medellin, Bucaramanga, and Barranquilla, Colombia.

36.   Between April 1, 2010, and March 4, 2011, the DEA wired a total of $244,454 in drug money to CITI-4795. On April 1, 2010, and April 27, 2010, the DEA wired a total of $118,374 to CITI-4795 out of $496,000 in drug proceeds the UC Operation picked up in Los Angeles, California on April 16, 2010. On March 4, 2011, the DEA wired $82,401 and $43,679 to CITI-4795 out of $287,850 in drug proceeds the UC Operation picked up in the Bronx, New York City on February 25, 2011.

37.    As further described below, the investigation has revealed that CITI-4795 is one

of accounts, along with an account described below at Deutsche Bank under the name *Compania*

*de Profesionales de Bolsa*, that ANDRES COVELLI CADAVID, a.k.a. "Don Andres" provided

to GUERRERO to launder drug proceeds for GUERRERO and the organization in Medellin.

## 2.    DEUTSCHE BANK TRUST COMPANY AMERICAS Account Number ▮▮▮▮▮▮▮ in the name of COMPANIA DE PROFESIONALES DE BOLSA ("DBTC-4296")

38.    DBTC-4296 is an account at Deutsche Bank Trust Company Americas ("Deutsche

Bank") in New York. According to records from Deutsche Bank, the account is in the name of

*Compania De Profesionales De Bolsa*, an exchange house in Colombia with offices in Bogotá.

39.    Between June 21, 2010, and March 4, 2011, the DEA wired a total of $743,256 in

drug money to DBTC-4296. On June 21, 2010, the DEA wired $95,000 and $97,000 to DBTC-

4296 out of $200,000 in drug proceeds the UC Operation picked up in Long Island, New York on

June 17, 2010. On July 1, 2010, the DEA wired $95,971 to DBTC-4296 out of $99,970 in drug

proceeds the UC Operation picked up in the Bronx, New York on June 29, 2010. On July 12,

2010, the DEA wired $13,200 and $215,184 to DBTC-4296 out of $237,900 in drug proceeds the

UC Operation picked up in the Bronx, New York on July 9, 2010. On March 4, 2011, the DEA

wired $79,500, $82,401, and $65,000 to DBTC-4296 out of $287,850 in drug proceeds the UC

Operation picked up in the Bronx, New York on February 25, 2011.

40.    In addition to these transfers of actual drug money, on April 6, 2011, following

GUERRERO's directions, the DEA wired a total of $400,000 ▮▮▮▮▮▮▮▮▮▮▮▮

in U.S. government funds to DBTC-4296 that UC-1 had represented to GUERRERO and

COVELLI was the proceeds of narcotics trafficking. Thereafter, on May 4, 2011, during an

undercover meeting in Bogota, GUERRERO and GOMEZ delivered approximately 665 million Colombian pesos to UC-1 and another DEA CS who was posing as one of UC-1's drug trafficking clients.

41.   As further described below, the investigation has revealed that DBTC-4296 is one of the accounts, along with CITI-4795 described above, that ANDRES COVELLI CADAVID, a.k.a. "Don Andres" provided to GUERRERO to launder drug proceeds for GUERRERO and the organization in Medellin.

### 3.   CITIBANK NA Account Number████████in the name of RECUBRIMIENTO RUSTOLEUM I, C.A. ("CITI-7012")

42.   CITI-7012 is an account at Citibank under the name *Recubrimiento Rustoleum I, C.A.* in Caracas, Venezuela.  According to records from Citibank, the account was opened on December 10, 2010, by David Hannaoui Babik.  Based on open source information, *Recubrimiento Rustoleum I, C.A.* appears to involved in the painting business and is located in Caracas, Venezuela.

43.   Between March 18, 2011, and May 10, 2011, the DEA wired a total of $232,096 in drug money to CITI-7012.  On March 18, 2011, the DEA wired $82,096 to CITI-7012 out of $1,300,090 the UC Operation picked up in Orlando, Florida on March 9, 2011.  On April 14, 2011, the DEA wired $70,000 to CITI-7012 out of $75,000 the UC Operation picked up in Boston, Massachusetts on April 12, 2010.  On April 27, 2011, the DEA wired $40,000 to CITI-7012 out of $199,790 the UC Operation picked up in New Jersey on April 25, 2011.  On May 10, 2011, the DEA wired $40,000 to CITI-7012 out of $499,685 the UC Operation picked up in New Jersey on May 4, 2011.

44.   Prior to these transactions, the DEA wired drug money into a personal checking

- 26 -

account in the name of the same David Hannaoui. In a short period of time, between September 3, 2010, and September 9, 2010, the DEA wired a total of $104,272 to a personal interest checking account at Bank of America, Account Number ██████████ in the name of David Hannaoui ("BOA-0644"). On September 3, 2010, the DEA wired $40,000 and $50,000 to BOA-0644 out of $367,845 the UC Operation picked up in Chicago, Illinois on September 1, 2010. On September 9, 2010, the DEA wired $14,272 to BOA-0644 out of $100,800 the UC Operation picked up in Boston, Massachusetts on September 7, 2010. According to BOA, BOA-0644 was closed on November 22, 2010.

4.   **CITIBANK NA Account Number** ██████████**, in the name of PINTURAS EL BARATILLO C.A. ("CITI-6046")**

45.    CITI-6046 is business checking account at Citibank in Miami, Florida. The account was opened on March 8, 2010, by Toni Hannaoui Babik, and is in the name of *Pinturas El Baratillo C.A.* Similar to CITI-7012 described above, based on open source information including internet searches, *Pinturas El Baratillo C.A.* also appears to be involved in the painting business and is based in Caracas, Venezuela. Also like CITI-7012, the account is in the name of individual with a last name of "Hannaoui."

46.    Between September 10, 2010, and April 7, 2011, the DEA wired a total of $137,600 in drug money to CITI-6046. On September 10, 2010, the DEA wired $50,600 to CITI-6046 out of $260,000 in drug proceeds the UC Operation picked up in Chicago on September 9, 2010. On March 14, 2011, the DEA wired $52,000 to CITI-6046 out of $1,300,090 the UC Operation picked up in Orlando, Florida on March 9, 2011. On April 7, 2011, the DEA wired $35,000 out of $266,336 the UC Operation picked up in New Jersey on April 5, 2011.

5.   **BANK OF AMERICA Account Number** ██████████ **in the name of**

## VENEZUELA FLUID SYSTEM TECHNOLOGIES ("BOA-4246")

47.     BOA-4246 is business checking account at Bank of America in Miami, Florida. The account was opened on March 26, 2007 and is in the name of *Venezuela Fluid System Technologies.* According to the Florida Department of State, Division of Corporations, *Venezuela Fluid System Technologies* is a Florida Corporation, incorporated on December 7, 2004, and the president of the company is Leonardo Montes Rodriguez. Based on public source information, including the company's website at www.swagelock.com, *Venezuela Fluid System Technologies* appears to be a wholesale supplier of pipes, fittings, and other fluid system supplies. The company is based in Venezuela, but also has a mailing address of 2704 Rew Circle, #102, Ocoee, Florida.

48.     Based on a preliminary analysis of bank records, it appears that the same day that funds are wired to BOA-4246, a similar amount of funds are then wired to a bank account under the name *Florida Fluid Systems Technologies*, Fifth Third Bank account number ▮▮▮▮▮▮▮ ("FTB-0692"). According to records from the Florida Department of State, Division of Corporations, *Florida Fluid Systems Technologies* is a Florida Corporation that was incorporated on November 30, 2000. As further described below, on several occasions, the funds that were wired from BOA-4246 to the account at Florida Fluid Systems, were returned to BOA-4246.

49.     In particular, on September 1, 2010, the DEA wired $200,000 to BOA-4246 out of $507,570 in drug money the UC Operation picked up in Atlanta, Georgia on August 30, 2010. According to bank records, the same day the DEA wired $200,000 to BOA-4246, $200,000 was wired from BOA-4246 to a bank account in the name of "Florida Fluid Systems Technologies," the FTB-0692 account described above. (This transfer from Venezuela Fluid Systems to Florida

- 28 -

Fluid Systems was reversed on September 7, 2010, but appears to have been re-sent to Florida Fluid System on September 13, 2010). Two days after this incoming transfer of $200,000 in drug money, on September 3, 2010, BOA-4246 received a second incoming wire transfer of $200,000 from AMI Trading (USA) Inc, a company which appears to be involved in the scrap metal business. On September 16, 2010, BOA-4246 wired $150,000 to FTB-0692 (Florida Fluid Systems), but that transfer then appears to have been reversed back to BOA-4246 on September 21, 2010. Then again on September 23, 2010, another $150,000 was wired from BOA-4246 to the account at Florida Fluid Systems, which was again reversed on September 28, 2010.

50.     Bank records also reveal that BOA-4246 received multiple wire transfers from Venafin SA, a *casa de bolsa* in Caracas, Venezuela that had a "Rosemont" Account at BOA, under Rosemont N Corporation. Between January 13, 2010, and May 5, 2010, BOA-4246 received four incoming wire transfers from Venafin, each in round dollar amounts, for a total of $670,000.

**6.     CITIBANK NA Account Number ████████ in the name of SBT S.A. ("CITI-9849")**

51.     CITI-9849 is a demand deposit account at Citibank in New York City. The account was opened up on June 1, 2009 and is in the name of *SBT S.A.* Based on public source information, *SBT SA* appears to be a textile import-export business and is located in Bogota, Colombia. According to Citibank, a customer contact for *SBT S.A.* is Rafaeal Herrera of Bogota, Colombia. Herrera is also listed as a customer contact for *Ci Del Istmo S.A.*, another textile import-export business in Bogota, Colombia which also has a bank account at Citibank, further described below as "CITI-9785." As further described below, the DEA has wired drug proceeds into both of these bank accounts.

52.     On September 1, 2010, the DEA wired $244,729 into CITI-9849 out of $507,570 in drug proceeds the UC Operation picked up in Atlanta, Georgia on August 30, 2010. The next day, on September 2, 2010, CITI-9849 wired $186,729 to another account at Citibank under the name *Ci Del Istmo S.A.*, CITI-9875, another account where Rafael Herrera is the president of the business. Between December 2, 2009, and September 24, 2010, CITI-9849 wired a total of $108,080 to CITI-9785, under the name *Ci Del Istmo S.A.*   In addition to these transfers from *SBT S.A.* (CITI-9849) to *Ci Del Istmo S.A.* ("CITI-9785"), between February 2010 and May 27, 2010, CITI-9849 wired a total of $1,316,510 to CITI-4795, an account at Citibank further described above in the name of *Corredores Associados S.A.*

53.     In addition to these funds, on May 17, 2010, CITI-9849 received an incoming wire transfer of $140,000 from an account under the name "Real Condominios," with an address of 2227 NW 79th Ave, Doral, Florida.   During the investigation, the "Real Condominios" account has been a frequent sender of funds into accounts that have been used to launder drug money on the BMPE.  For example, on October 8, 2009, Real Condominios wired $15,985 to an account under the name "Microside" in Florida.  On January 8, 2010, Real Condominios wired $48,600 to an account under the name of "Baccell" Corporation.  The DEA seized both of these accounts on January 20, 2010, and were accounts that GUERRERO provided to UC-1 to launder portions of the drug money the UC Operation picked up in Houston, Texas in early 2010.

7.     **CITIBANK NA Account Number███████ in the name of CI DEL ISTMO S.A. ("CITI-9785")**

54.     As further described above, CITI-9785 is an international checking account at Citibank in New York City.  According to records from Citibank, CITI-9785 was opened on February 23, 2009, and is in the name of *CI Del Istmo S.A.*.  Similar to the prior account, CITI-

9849 (in the name of *SBT S.A.*) appears to be a textile import-export company in Bogota, Colombia and whose president is Rafael Herrera, the same individual who is also the president of *SBT S.A.*

55.    On September 3, 2010, the DEA wired $81,292 to CITI-9785 out of $367,845 in drug proceeds the UC Operation picked up in Chicago, Illinois on September 1, 2010.  Similar to CITI-9849, between February 3, 2010, and June 1, 2010, CITI-9849 wired a total of $4,988,450 to CITI-4795, an account at Citibank further described above in the name of *Corredores Associados S.A.*

**8.    MERCANTIL COMMERCE BANK NA Account Number████████ under the name HECTOR URENA SANCHEZ ("MCB-7706")**

56.    MCB-7706 is a personal account at Mercantil Commerce Bank in Miami, Florida. MCB-7706 was opened on August 7, 2007, and is in the name of Hector Urena Sanchez, the authorized signer on the account.  According to bank records, Hector Urena Sanchez resides in both Florida and Venezuela.

57.    Between August 4, 2010, and September 3, 2010, the DEA wired a total of $95,000 in drug money to MCB-7706.  On August 4, 2010, the DEA wired $35,000 to MCB-7706 out of $223,820 in drug proceeds the UC Operation picked up in Chicago, Illinois on July 30, 2010.  On September 1, 2010, the DEA wired $20,000 to MCB-7706 out of $507,570 in drug proceeds the UC Operation picked up in Atlanta, Georgia on August 30, 2010.  On September 3, 2010, the DEA executed two different wire transfers of $30,000 and $10,000 to MCB-7706 out of $367,845 in drug proceeds the UC Operation picked up in Chicago, Illinois on September 1, 2010.

58.    Based on a preliminary analysis of bank records, it appears that the funds,

including the drug money, that was wired into MCB-7706 was disbursed in round dollars

amounts to several different individuals and business entities, including a $30,000 transfer on

August 27, 2010, to CITI-9785, in the name of *CI Del Istmo S.A.*, which is further described

above, and $3,000 to an account under the name Juan Wilson Perez Cote on May 7, 2010 which,

as further described below, is another account into which the DEA wire transferred drug money.

**9.    MERCANTIL COMMERCE BANK NA Account Number▇▇▇▇▇ in
       the name of JUAN WILSON PEREZ COTE ("MCB-5606")**

59.    MCB-5606 is a personal account at Mercantil Commerce Bank in Miami, Florida.

MCB-5606 was opened on September 9, 1997, and the authorized signers on the account are

Juan Wilson Perez Cote and Marisol Carrillo Chacon.  According to records from Mercantil

Commerce Bank, Juan Wilson Perez Cote resides in Venezuela.

60.    On August 4, 2010, the DEA wired $15,000 to MCB-5606 out of $223,820 in

drug proceeds the UC Operation picked up in Chicago, Illinois on July 30, 2010.  On September

1, 2010, the DEA wired $20,000 to MCB-5606 out of $507,570 in drug money picked up in

Atlanta, Georgia on August 30, 2010.  In addition to these transfers of drug proceeds, on May 7,

2010, MCB-5606 wired $3,000 to the account described above, another account at Mercantil

Commerce Bank in the name of Hector Urena Sanchez.  Furthermore, shortly before receiving

$20,000 in drug money from the DEA's undercover account on September 1, 2010, on August

27, 2010, MCB-5606 received an incoming wire transfer of $23,500 from CITI-9785, in the

name of *CI Del Istmo S.A.*.   As further described above, the president of *CI Del Istmo S.A.*,

Rafael Herrera, is also the president of *SBT S.A.*, which as further described above is the name of

CITI-9849.

61.    As further described above, during the investigation, the DEA wired drug

- 32 -

proceeds to each of these four accounts: MCB-7706 in the name of Hector Urena Sanchez;

MCB-5606, in the name of Juan Wilson Perez Cote; CITI-9849, in the name of *SBT S.A.;* and

CITI-9785, in the name of *CI Del Istmo S.A.*

   **10.   HSBC BANK USA Account Number ████████ in the name of VELTGELT
   LLC ("HSBC-8804")**

   62.    HSBC-8804 is a business direct checking account at HSBC Bank USA ("HSBC")

in New York City.  According to records from Citibank, HSBC-8804 was opened on December

10, 2008, and is in the name of *Veltgelt LLC.*  According to New York State, Division of

Corporations, *Veltgelt LLC* is a New York Limited Liability Company that was incorporated on

November 19, 2007.  The company's address is listed as 1725 Avenue M, Brooklyn, New York,

New York 11230.  The authorized signer on the account is Mark Cukier.  Veltgelt has a website,

www.veltgelt.com, that had been displayed as being under construction for several months and

simply provides two contact email address, newyork@veltgelt.com and caracas@veltgelt.com,

and what appears to be graphic depicting the exchange of U.S. dollars for Venezuelan Bolivars.

The website depicts U.S. dollars with an arrow pointing one way, and Venezuela Bolivars with

an arrow pointing the opposite direction.

   63.    Between June 10, 2010, and February 25, 2011, the DEA has wired a total of

$331,236 in drug money to HSBC-8804.  On June 10, 2010, the DEA wired $100,000 to HSBC-

8804 out of $135,645 in drug proceeds the UC Operation picked up in Long Island, New York on

June 8, 2010.  On January 5, 2011, the DEA wired $92,420 to HSBC-8804 out of $486,677 in

drug proceeds the UC Operation picked up in San Juan, Puerto Rico on January 4, 2011.  On

January 25, 2011, the DEA wired $86,496 to HSBC-8804 out of $90,100 in drug proceeds the

UC Operation picked up in Queens, New York City on January 18, 2011.  On February 25, 2011,

the DEA wired $52,320 to HSBC-8804 out of $54,500 in drug proceeds the UC Operation picked up in the Bronx, New York City on February 21, 2011.

64.     Based on a preliminary analysis of bank records, it appears that *Veltgelt LLC* is involved in the movement and exchange of U.S. dollars and Venezuelan Bolivars through the *permuta* process, a parallel market for U.S. dollars that since approximately May 2010 has been illegal in Venezuela.  As further described above, the structure of these transactions allow U.S. dollars to be received at U.S. banks and paid out in a corresponding amount of Venezuelan Bolivars in Venezuela, outside the jurisdiction and oversight of the U.S. government.

**11.    REGIONS BANK Account Number ▓▓▓▓▓ ("REGS-1430") and CITIBANK NA Account Number ▓▓▓▓▓ ("CITI-5049"), both under the name CELL TECH ELECTRONICS INC;**

65.     REGS-1430 is a business checking account at Regions Bank in Doral, Florida that was opened on August 21, 2008.  CITI-5049 is a business checking account at Citibank in Florida that was opened on July 7, 2010.  Both REGS-1430 and CITI-5049 are in the name of *Cell Tech Electronics Inc*, a Florida corporation that was incorporated on August 15, 2008. Neile Faria is the president of *Cell Tech Electronics* and is one of the authorized signers on both accounts.  According to the company's website, www.celltechinc.com, the company is a wholesale purchaser and supplier of cellular phones and accessories.

66.     On August 30, 2010, the DEA wired $29,950 to REGS-1430 out of $223,820 in drug proceeds the UC Operation picked up in Chicago, Illinois on July 30, 2010.  On February 10, 2011, the DEA wired $27,719 to CITI-5049 out of $481,999 in drug proceeds the UC Operation picked up in Chicago, Illinois on February 7, 2011.

67     Furthermore, according to records from Citibank, between July 8, 2010, and

September 8, 2010, approximately $108,820 appears to have been deposited into CITI-5049 in a structured manner designed to avoid reporting requirements for cash deposits in amounts $10,000 or more. For example, on September 1, 2010, there were three different cash deposits - $4,000, $3,940, and $3,860, each under $10,000, but totaling $11,800 - into CITI-5049 at three different branches in Chicago, Illinois, between the hours of 9:15 a.m. and 10:57 a.m., even though the business, *Cell Tech Electronics,* is located in Florida. Thereafter, on September 8, 2010, there were three different deposits of cash ($5,000, $3,540, and $3,480, each under $10,000, but totaling $12,020), at three different branches of Citibank in the Chicago area, between the hours of 11:05 a.m. and 3:00 p.m.

> **12.   BANK OF AMERICA Account Number⬛⬛⬛⬛⬛, in the name of MIGUEL KHABBAZ ("BOA-2191") and BANK OF AMERICA Account Number⬛⬛⬛⬛⬛ in the name of INVERSIONES RAMKA ("BOA-6796")**

68.     BOA-2191 is a regular checking account at Bank of America in New York City. The account was opened on March 23, 2010, and is in the name of Miguel A. Khabbaz Sevilla, the authorized signer on the account. According to records from Bank of America, Miguel Khabbaz resides in both Florida and Venezuela and is the owner of a company called *Inversiones Ramka,* a Florida corporation in Hialeah, Florida of which Khabbaz is also an officer. According to the company's website, www.inversionesramka.com, the company is a wholesaler of fragrances and beauty products.

69.     On September 10, 2010, the DEA wired $50,000 to BOA-2191 out of $260,000 in drug proceeds the UC Operation picked up in Chicago, Illinois on September 9, 2010. On September 14, 2010, the DEA wired $39,000 to BOA-2191 out of $406,745 in drug proceeds the UC Operation picked up in the Bronx, New York City on September 10, 2010. According to a

preliminary analysis of bank records, BOA-2191 has sent multiple wire transfers to Bank of America account number ██████████ in the name of *Inversiones Ramka* ("BOA-6796"), of which, as described above, Khabbaz is an officer. In particular, between August 28, 2009, and September 15, 2010, BOA-2191 wired a total of $69,223.25 to BOA-6796. In addition to the transfers from BOA-2191 to BOA-6796, there were also several ATM transactions from the BOA-2191 account, withdrawals, deposits, and transfers of funds, from Quincy and Malden, Massachusetts.

70.     Furthermore, an analysis of the records from this bank account, BOA-6796, under the name *Inversiones Ramka*, reveals that BOA-6796 wired funds to several other accounts into which the DEA wired drug money on behalf of the targets of the investigation including a total of $392,919.50 to an account at Wachovia in Miami, Florida, account number ██████████ under the name *Perfume Market LLC*, further described below as WACH-4873. (On September 3, 2010, the DEA wired $20,000 in drug proceeds to WACH-4873). In addition to this transfer, on June 1, 2010, BOA-6796 received an incoming wire from an account in ██████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████

### 13.   CITIBANK NA Account Number ██████████ in the name of ASTRID MONCADO ("CITI-4844")

71.     CITI-4844 is a regular checking account at Citibank in Miami, Florida. According to records from Citibank, CITI-4844 was opened on August 7, 2010, in the name of

Astrid V. Moncado, the authorized signer on the account who resides in Venezuela. According to the account opening documents, Moncado is also listed as being unemployed.

72.     About a month after the account was opened, on September 14, 2010, the DEA wired $37,000 to CITI-4844 out of $406,745 in drug proceeds the UC Operation picked up in the Bronx, New York City on September 10, 2010. According to bank records, three days after the incoming wire transfer of $37,000 in drug proceeds, on September 17, 2010, CITI-4844 wired $32,314 an account in ███████████████████████████████████████████████████ne ███████████████████████████████████████████████████ "███████" an account into which UC-1 has been directed to wire transfer drug proceeds on multiple occasions. Around the same time, CITI-4844 received several wire transfers in amounts ranging from $1,000 to $750 from another account at Citibank, account number ████████ n the name of Javier Guerrero ("CITI-0139") which is further described below.

**14.     CITIBANK NA Account Number██████████ in the name of JAVIER GUERRERO ("CITI-0139")**

73.     CITI-0139 is an interest checking account at Citibank in Miami, Florida. According to records from Citibank, the account was opened on August 30, 2010, and is in the name of Javier G. Guerrero, the authorized signer on the account who resides in Venezuela and Florida. On September 14, 2010, the DEA wired $38,000 to CITI-0139 out of $406,745 in drug proceeds the UC Operation picked up in the Bronx, New York City on September 10, 2010. Based on a preliminary analysis of bank records, similar to the account above (CITI-4844 in the name of Astrid Moncado), two days after the incoming wire transfer of drug proceeds, on September 16, 2010, CITI-0139 wired $33,472 to an account in ████████████████████ nt ██████ ████████ the ████████ (██████████), which as further described below

is an account into which UC-1 has been directed to wire transfer drug proceeds on multiple occasions.

15. **FIRST THIRD BANK Account Number** ███████████ **in the name of FLORIDA FLUID SYSTEMS TECHNOLOGIES ("FTB-0692")**

74.      As further described above, on September 1, 2010, the DEA wired $200,000 in drug proceeds to an account at Bank of America (BOA-4246) in the name of *Venezuela Fluid Systems Technologies*. The same day, BOA-4246 transferred the same amount, $200,000, to FTB-0692, an account at First Third Bank in the name of *Florida Fluid Systems Technologies*, a Florida Corporation that was incorporated on November 30, 2000. On several occasions, the funds that were wired from BOA-4246 to FTB-0692 were returned to BOA-4246, but then re-sent to FTB-0692.

75.      In particular, on September 1, 2010, the DEA wired $200,000 to BOA-4246 out of $507,570 in drug money the UC Operation picked up in Atlanta, Georgia on August 30, 2010. According to bank records, the same day the DEA wired $200,000 to BOA-4246, $200,000 was wired from BOA-4246 to a bank account in the name of "Florida Fluid Systems Technologies," the FTB-0692 account described above. (This transfer from Venezuela Fluid Systems to Florida Fluid Systems was reversed on September 7, 2010, but appears to have been re-sent to Florida Fluid System on September 13, 2010). On September 16, 2010, BOA-4246 wired $150,000 to FTB-0692 (Florida Fluid Systems), but that transfer then appears to have been reversed back to BOA-4246 on September 21, 2010. Then again on September 23, 2010, another $150,000 was wired from BOA-4246 to the account at Florida Fluid Systems, which was again reversed on September 28, 2010.

16. **MERCANTIL COMMERCE BANK NA Account Number** ███████████ **in**

**the name of NELSON ARMANDO SANCHEZ CASTILLO ("MCB-5706")
and WACHOVIA BANK Account Number** ███████████ **in the name of
TOMCAR INVEST USA INC ("WACH-4724")**

76.      MCB-5706 is an account at Mercantil Commerce Bank in Miami, Florida.

According to records from Mercantil Commerce Bank, the account was opened on May 13,

2010, ans is in the name of Nelson Armando Sanchez Castillo who resides in Venezuela.

WACH-4724 is a business checking account at Wachovia Bank in Miami, Florida.  According to

records from Wachovia, the account was July 14, 2005, and is in the name of *Tomcar Invest USA*

*Inc.* According to open source information including internet research, *Tomcar Invest USA Inc* is

a Florida corporation based in Doral, Florida and is involved in the transportation of freight and

cargo.

77.      On September 10, 2010, the DEA wired $40,000 to MCB-5706 out of $260,000 in

drug proceeds the UC Operation picked up in Chicago, Illinois on September 9, 2010.  In

addition to this undercover wire transfer of drug money, according to bank records, MCB-5706,

on September 1, 2010, MCB-5706 received an incoming wire transfer of $30,000 from an

account that is further described above as MCB-7706 in the name of Hector Urena Sanchez, an

account into which between August 4, 2010, and September 3, 2010, the DEA wired a total of

$95,000 in drug money. Thereafter, on November 3 and 5, 2010, deposited checks in the amount

of $25,000 and $16,500 drawn on WACH-4724 in the name of *Tomcar Invest USA Inc* which

was recorded as being "loan return/transfer."

78.      On October 13, 2010, the DEA wired $50,000 to WACH-4724 out of $200,000 in

drug proceeds the UC Operation picked up on October 7, 2010 in the Bronx, New York.  In

addition to this undercover wire transfer of drug money on October 13, 2010, the next day on

October 14, 2010, WACH-4724 received an incoming wire transfer of $115,000 from an account described above as CITI-9785, an account at Citibank under the name *Ci Del Istmo SA*, which appears to be a textile import/export company in Venezuela. The following day, on October 15, 2010, WACH-4724 received another incoming wire transfer from CITI-9785 in the amount of $135,000. On September 3, 2010, the DEA wired $81,292 in drug money to this same account, CITI-9785 in the name of *Ci Del Istmo*.

**B.    Banks Accounts For Which the Seizure of Only the Amount of Funds Laundered Through the Target Accounts is Sought**

**1.    $30,000.00 in BANK OF AMERICA Account Number ▆▆▆▆▆▆ in the name of CELL TRADE INC ("BOA-4952")**

79.    BOA-4952 is a business checking account at Bank of America in St. Louis, Missouri. According to records from Bank of America, the account was opened on November 29, 2005, and is in the name of *Cell Trade Inc.*, a wholesale purchaser and seller of cellular phones that is incorporated in both Missouri and Florida. The authorized signer on the account is Cristobal Perez.

80.    On August 30, 2010, the DEA wired $30,000 to BOA-4952 out of $223,820 in drug proceeds the UC Operation picked up in Chicago, Illinois on July 30, 2010. In addition to these funds, between approximately January 1, 2009, and August 31, 2010, BOA-4952 also wired a total of $1,080,216 to a *casa de cambio* in Mexico, *Casa De Cambio Tiber SA* in Cuauhtemoc, Mexico.

**2.    $55,000.00 in BANK OF AMERICA Account Number ▆▆▆▆▆▆ in the name of GIOVANNI SANCHEZ ("BOA-6986")**

81.    BOA-6986 is a regular checking account at Bank of America in Miami, Florida. According to records from Bank of America, the account is in the name of Giovanni Antonio

Sanchez, who is the authorized signer on the account. On September 14, 2010, the DEA wired

$40,000 and $15,000 to BOA-6986 out of $406,745 in drug proceeds the UC Operation picked

up in the Bronx, New York City on September 9, 2010.

**3.      $40,000.00 in BANK OF AMERICA Account Number███████ in the
name of IMPEXSA CORP DBA MAKERS SHOES ("BOA-5740")**

82.      BOA-5740 is an account at Bank of America in Miami, Florida under the name

*Impexsa Corp d/b/a Makers Shoes.* According to records from the Florida Department of State,

Division of Corporations, *Impexsa Corp* is a Florida corporation incorporated on May 13, 2004.

Furthermore, according to public source information, including the company's website,

www.makershoes.com, the company is an import/export wholesaler of women's shoes. On

March 14, 2011, the DEA wired $40,000 to BOA-5740 out of $300,000 in drug proceeds the UC

Operation picked up in the Bronx, New York City on March 4, 2011.

**4.      $118,000.00 in BANK OF AMERICA Account Number █████, in the
name of CORPORACION M.O.G. 21 CA ("BOA-7001")**

83.      BOA-7001 is an account at Bank of America in Los Angeles, California, which is

under the name *Corporacion M.O.G. 21 CA.* Investigators could not locate any information

about this particular entity. On April 1, 2011, the DEA wired $118,000 to BOA-7001 out of

$300,000 in drug money that the UC Operation picked up on March 29, 2011.

**5.      $30,180.00 in BANK OF AMERICA Account Number██████in the
name of VICTOR ALEJO PRADA ("BOA-5310")**

84.      BOA-5310 is an account at Bank of America in Miami, Florida under the name of

Victor Alejo Prada. On May 9, 2011, the DEA wired $30,180 to BOA-5310 out of $499,685 in

drug money the UC Operation picked up in New Jersey on May 4, 2011.

**6.      $30,399.50 in BBU BANK Account Number█████n the name of A&L**

## NETWORK ELECTRONIC C.A. ("BBU-2001")

85.     BBU-2001 is a checking account at BBU Bank in Florida.  According to records

from BBU Bank, the account was opened on August 25, 2010, and is in the name of *A&L*

*Network Electronic C.A.*, which based on public source information including internet searches

appears to be an importer and exporter of electronic and computer related products in Venezuela.

On March 18, 2011, the DEA wired $30,999.50 to BBU-2001.

**7.     $83,000 in CITIBANK NA Account Number⬛⬛⬛⬛⬛ in the name of
LUNA SULTAN ("CITI-3426")**

86.     CITI-3426 is a regular checking account at Citibank in Miami, Florida.

According to records from Citibank, CITI-3426 was opened on February 5, 2010, and is in the

name of two individuals, Luna Sultan and Leopoldo Sultan.  Based on records from Citibank,

Luna Sultan has a Venezuelan passport, but resides in Bal Harbour, Florida in a residence that

was purchased for more than $1.3 million in October 2004.

87.     On September 9, 2010, the DEA wired $83,000 to CITI-3426 out of $100,800 in

drug proceeds the UC Operation picked up in Boston, Massachusetts on September 9, 2010.

Based on a preliminary analysis of bank records, once the drug money was transferred into CITI-

3426 on September 9, 2010, on September 13, 2010, $40,000 was wired to Leopoldo Sultan in

Madrid, Spain.  There after there were cash withdrawals and other payments by check and wire

transfer to individuals who appear to be relatives of Luna Sultan.

**8.     $50,000.00 in CITIBANK NA Account Number⬛⬛⬛⬛ in the name of
GIOCONDO BUSO ("CITI-4535")**

88.     CITI-4535 is an account at Citibank in Miami, Florida.  The account was opened

on April 18, 2005, and is in the name of Giocondo Buso, the authorized signer on the account.

On March 14, 2011, the DEA wired $50,000 to CITI-4535 out of $1,300,090 in drug proceeds the UC Operation picked up on March 9, 2011.

**9.    $35,000.00 in CITIBANK NA Account Number███████, in the name of AROBIGSTEPS HOLDINGS LLC ("CITI-7048")**

89.    CITI-7048 is a business checking account at Citibank in Doral, Florida.

According to records from Citibank, the account was opened on November 1, 2010 and is in the name of *Arobigsteps Holdings LLC*, a Florida corporation that was incorporated on October 22, 2010.   Based on public source information including internet research, *Arobigsteps Holdings LLC* is a business located in Doral, Florida and is an importer-exporter of machinery, equipment, and medical equipment.  On March 17, 2011, the DEA wired $35,000 to CITI-7048 out of $1,300,090 in drug proceeds the UC Operation picked up on March 9, 2011.

**10.    $50,000.00 in CITIBANK NA Account Number ███████ in the name of GERMAN ALONSO GOMEZ ("CITI-0118")**

90.    CITI-0118 is an account at Citibank in Miami, Florida.  The account is in the name of German Alonso Gomez.  On May 9, 2011, the DEA wired $50,000 to CITI-0118 out of $499,685 in drug proceeds the UC Operation picked up in New Jersey on May 4, 2011.

**11.    $50,000.00 in CITIBANK, N.A. Account Number███████under the name of JORGE URIBE ("CITI-9246")**

91.    CITI-9246 is an account at Citibank in Coral Gables, Florida.  The account is in the name of Jorge Uribe.  As part of the same pick up  of drug proceeds involving $499,685 in New Jersey on May 4, 2011, described above, the DEA wired $50,000 to CITI-9256.

**12.    $50,000.00 in Commerce Bank NA Account Number███████, in the name of RAMON EDUARDO ESPINAL ("COM-0112")**

92.    COM-0112 is an account at Citibank in Miami, Florida.  The account is in the

name of Ramon Eduardo Espinal of Caracas, Venezuela. Similar to the two transactions

described above, as part of the same pick up of drug proceeds involving $499,685 in New Jersey

on May 4, 2011, the DEA wired $50,000 to COM-0112.

**13.   $120,000.00 in HELM BANK USA Account Number⬛⬛⬛⬛
in the name of C. ARTE COLLECTION C.A. ("HELM-1925")**

93.     HELM-1925 is a demand deposit account at Helm Bank in New York City.

According to records from Helm Bank, the account was opened on July 27, 2010, in the name of

*C. Arte Collection C.A.* Based on account opening documents and public source information

including internet research, *C. Arte Collection C.A.* is a jewelry business based in Venezuela. On

September 3, 2010, the DEA wired $120,000 to HELM-1925 out of $367,845 the UC Operation

picked up in Chicago, Illinois on September 3, 2010.

**14.   $55,000.00 in Helm Bank USA Account Number⬛⬛⬛⬛in the name of
CONSORCIO PUBLICITARIO DEL CENTRO ("HELM-9665")**

94.     HELM-9665 is a commercial checking account at Helm Bank that is in the name

of *Consorcio Publicitario Del Centro,* which based on public source information including

internet searches appears to a kind of embroidery or advertising business in Venezuela. The

account was opened on May 7, 2010, and the authorized signer on the account is Juan E.

Sanchez. On March 14, 2011, the DEA wired $55,000 to HELM-9665 out of $1,300,090 in drug

money the UC Operation picked up on March 9, 2011, in Orlando, Florida.

**15.   $60,000.00 in HELM BANK USA Account Number⬛⬛⬛⬛in the name
of YARA LEYDEC CERRO ("HELM-7723")**

95.     HELM-7723 is a checking account at Helm Bank. According to records from

Helm Bank, the account was opened on October 22, 2009, and is in the name of both Yara

Leydec Cerro and Jorge Antonio Katouch who reside in Venezuela. On March 14, 2011, the

DEA wired $60,000 to HELM-7723 out of $1,300,090 in drug money the UC Operation picked

up on March 9, 2011, in Orlando, Florida.

**15.   JGB BANK Account Number** ███████ **in the name of GLOBAL ESCAL**
**C.A. ("JGB-1915")**

96.   JGB-1915 is an account at JGB Bank in Miami, Florida.  According to records

from JGB Bank, the account was opened on April 28, 2005, and is in the name of *Global Escal*

*C.A.*, a company based in Venezuela and is in the business of importing and exporting

automobiles, trucks and other equipment.  According to records from JGB Bank, the principal of

the *Global Escal* is Gabriel Jesus Escalona who has an address in both Florida and Venezuela.

97.   On September 14, 2010, the DEA executed two different wire transfers of

$90,000 to JGB-1915 out of $406,745 in drug proceeds the UC Operation picked up in the

Bronx, New York City on September 10, 2010.  According to bank records from JCB Bank,

following the two September 14, 2010, incoming wire transfers of $90,000, three days later on

September 17, 2010, $90,000 was wired from JCB-1915 to an account under the name Hector

Enrique Lopez Oropeza, who is believed to be the president of another construction and

machinery company in Venezuela, Confort Suite CA.

**16.   $44,517.20 in HSBC BANK USA Account Number** ███████ **, in the name of**
**GAME CENTER DISTRIBUTION INC ("HSBC-3865")**

98.   HSBC-3865 is a business checking account at HSBC in Los Angeles, California.

According to records from HSBC, the account was opened on April 10, 2009, and is in the name

of *Game Center Distribution Inc.*, a California corporation which according to open source

information and internet searches appears to be a wholesaler of video games, systems and

accessories.  On August 4, 2010, the DEA wired $44,517.20 to HSBC-3865 out of $223,820 in

drug proceeds the UC Operation picked up in Chicago, Illinois on July 30, 2010.

17.   **$30,050 in JP MORGAN CHASE Account Number███████, in the name of FLORIDA STATE GAMES INC ("JPM-1247")**

99.   JPM-1247 is a business checking account at JP Morgan Chase in Ft. Lauderdale, Florida. According to records from JP Morgan Chase, the account was opened on July 26, 2004, and is in the name of *Florida State Games Inc.*, a Florida corporation incorporated in 1991. According to open source information and internet research including the company's website, www.floridastategames.net, *Florida State Games Inc* appears to be a wholesaler and distributor of video games. On August 4, 2010, the DEA wired $27,000 and $3,050 to JPM-1247 out of $223,820 in drug proceeds the UC Operation picked up in Chicago, Illinois on July 30, 2010.

18.   **$37,000.00 in JP MORGAN CHASE BANK Account Number████████ in the name of NES JEWELRY INC ("JPM-3665")**

100.   JPM-3665 is a business checking account at JP Morgan Chase in New York City. According to records from JP Morgan Chase, the account was opened on January 26, 2000, and is in the name of *NES Jewelry Inc.* According to open source information and internet searches including the company's website, www.nesjewelry.com, *NES Jewelry* is a New York corporation and a jewelry business in Manhattan, New York City. On March 14, 2011, the DEA wired $37,000 out of $300,000 in drug proceeds the UC Operation picked up in the Bronx, New York City on March 4, 2011.

19.   **$50,000.00 in MERCANTIL COMMERCE BANK NA Account Number██████████in the name of FIDEL SALAS ("MBC-5806")**

101.   MBC-5806 is an account at Mercantil Commerce Bank in Coral Cables, Florida. According to records from Mercentail Commerce Bank, the account was opened on March 9, 2007, and is in the name of Fidel Sales, though the true name of authorized signer appears to be

Fidel Sabas Borrero Morales, who resides in Venezuela. The account opening documents indicate that Sabas is employed as cattle ranch and gas station owner. On February 10, 2011, the DEA wired $50,000 to MBC-5806 out of $100,000 the UC Operation picked up in Somerville, Massachusetts on February 8, 2011.

**20.    $45,000.00 in OCEAN BANK Account Number▇▇▇▇▇ in the name of WAREHOUSE CELLULAR ("OCB-8105")**

102.    OCB-8105 is a business checking account at Ocean Bank in Miami, Florida. According to records from Ocean Bank, the account was opened on April 11, 2005, and is in the name of *Warehouse Cellular*, a Florida corporation. According to open source information including internet searches, *Warehouse Cellular Inc* is a wholesaler of cellular phones. On March 18, 2011, the DEA wired $45,000 to OCB-8105 out of $1,300,090 in drug proceeds the UC Operation picked up on March 9, 2011 in Orlando, Florida.

**21.    $29,000.00 in US CENTURY BANK Account Number ▇▇▇▇▇ in the name of MIAMI PERFUME JUNCTION INC ("USCB-0373")**

103.    USCB-0373 is a "cash collateral account" at U.S. Century Bank in Miami, Florida and is in the name of *Miami Perfume Junction Inc,* a Florida corporation incorporated in 1998. According to open source information, including internet searches, *Miami Perfume Junction Inc* appears to be a wholesaler of perfume and colognes. On September 10, 2010, the DEA wired $29,000 out of $260,000 in drug proceeds the UC Operation picked up in Chicago, Illinois on September 9, 2010.

**22.    $20,000.00 in WACHOVIA BANK Account Number▇▇▇▇▇ in the name of PERFUME MARKET LLC ("WACH-4873")**

104.    WACH-4873 is a commercial checking account at Wachovia Bank in Miami, Florida. According to records from Wachovia Bank, the account was opened on March 14, 2006

and is in the name of *Perfume Market LLC dba Ricmar Perfumes*, a Florida corporation.

According to open source information and internet research including the company's website,

www.perfumemarket.net, the company appears to be a wholesaler and retailer distributor of

fragrances and perfume.  On September 3, 2010, the DEA wired $20,000 to WACH-4873 out of

$367,845 in drug proceeds the UC Operation picked up in Chicago, Illinois on September 1,

2010.

> **23.**  **$30,000.00 in WACHOVIA BANK Account Number** ██████████ **, in the name of PANE LUCIANO VINCENT ("WACH-1809")**

105.    WACH-1809 is a money market account at Wachovia Bank in Miami, Florida.

According to records from Wachovia Bank, the account was opened on November 16, 2009, and

is in the name of Luciano Vicente Pane, who resides in Venezuela but also has an Italian

passport.  On October 8, 2010, the DEA wired $30,000 to WACH-1809 out of $200,000 in drug

money the UC Operation picked up in the Bronx, New York City on October 7, 2010.

> **24.**  **$100,000.00 in WACHOVIA BANK Account Number** ██████████ **in the name of GIL FAMILY INVESTMENT CP ("WACH-0233")**

106.    WACH-0233 is a money market account at Wachovia Bank in Florida.

According to records from Wachovia Bank, the account was opened on November 28, 2007.

The authorized signer on the account is Yosi Gil.  According to open source information

including internet research, Yosi Gil is a partner in a luxury residential real estate development

firm called J. Milton & Associates, located in Miami.  On February 10, 2011, the DEA wired

$100,000 to WACH-0233 out of $481,999 the UC Operation picked up in Chicago, Illinois on

February 7, 2011.

> **25.**  **$50,000.00 in WACHOVIA BANK Account Number** ██████████ **n the name of ANTOINE KARAM ("WACH-9287")**

107.    WACH-9287 is an account at Wachovia Bank in Doral Florida. The account is in the name of Antoine Karam. On March 16, 2011, the DEA wired $50,000 to WACH-9287 out of $1,300,090 in drug proceeds the UC Operation picked up in Orlando, Florida on March 9, 2011.

**26.    $50,000.00 in WACHOVIA BANK Account Number⬛⬛⬛⬛⬛⬛⬛ in the name of JESUS SALVATIERRA FLORES ("WACH-9664")**

108.    WACH-9664 is an account at Wachovia Bank in Florida. The account is in the name of Jesus Salvatierra Flores. On March 16, 2011, the DEA wired $50,000 to WACH-9664 out of $1,300,090 in drug proceeds the UC Operation picked up in Orlando, Florida on March 9, 2011.

**27.    $110,000.00 in WACHOVIA BANK Account Number⬛⬛⬛⬛⬛⬛⬛, in the name of JORGE ANDRES APARICIO ACEVEDO ("WACH-4599")**

109.    WACH-4599 is an account at Wachovia Bank in Florida under the name Jorge Andres Aparicio Acevedo. On March 17, 2011, the DEA wired $70,000 to WACH-4599 out of $1,300,090 in drug proceeds the UC Operation picked up in Orlando, Florida on March 9, 2011. Thereafter, on April 1, 2011, the DEA wired $40,000 to WACH-4599 out of $300,000 in drug proceeds the UC Operation picked up in the Bronx, New York City on March 29, 2011.

**28.    $138,875.00 in WACHOVIA BANK Account Number ⬛⬛⬛⬛⬛⬛⬛ in the name of JOSE ANGEL RIVERO ("WACH-5046")**

110.    WACH-5046 is an account at Wachovia Bank in Allentown, Pennsylvania which is in the name of Jose Angel Rivero. On April 8, 2011, the DEA wired $40,000 to WACH-5046 out of $300,000 in drug money the UC Operation picked up in the Bronx, New York City on March 29, 2011. On April 14, 2011, the DEA wired $98,875 to WACH-5046 out of $100,000 in drug proceeds the UC Operation picked up in Somerville, Massachusetts.

**29.    $200,000.00 in WASHINGTON MUTUAL BANK Account Number
███████████in the name of CAPITAL FINANCIAL S.E.S. LLC ("WMB-
4210")**

111.    WMB-4210 is an account at Washington Mutual Bank in Mirimar, Florida.

According to records from Washington Mutual Bank, the account was opened on April 21, 2010

and is in the name of *Capital Financial S.E.S. LLC*.  The authorized signers on the account are

Domingo Somaza and Fernando E. Melean.  According to open source information including

internet searches, *Capital Financial S.E.S. LLC* is an investments holding and consulting

business incorporated as a limited liability company in Florida.  On March 14, 2011, the DEA

wired $200,000 to WMB-4210 out of $300,000 in drug proceeds the UC Operation picked up in

the Bronx, New York City on March 4, 2011.

## IV. UNDERCOVER MONEY LAUNDERING TRANSACTIONS

119.    As further described in **Attachment B**, on the dates listed in **Attachment B**, the

targets of the investigation, mostly GUERRERO, JAUREGUI, and ZAMBRANO arranged for

the UC operation to pick up drug money at various cities in the United States, and then directed

UC-1 to wire-transfer the money to bank accounts both in the United States and outside the

United States, including the target accounts described herein.  Most of the accounts to which the

money was transferred were held in the names of various business entities and individuals in

South Florida, New York City, California, Panama, Hong Kong, and China.

120.    During and in connection with each of these transactions, UC-1 has had multiple

recorded communications with the targets of the investigation, primarily GUERRERO, including

phone calls, emails, MSN Instant Messaging, and Blackberry Pin-to-Pin communications  In the

following paragraphs, I have summarized the facts surrounding several of these DEA money pick

up s and subsequent wire transfers, including summaries of numerous pertinent consensually

recorded communications that UC-1 has had with the targets of the investigation, primarily

GUERRERO, JAUREGUI, and ZAMBRANO.  These summaries are, for the most part, based

upon UC-1's English-language summaries of his telephone conversations, which took place in

Spanish and have been preliminarily translated into English by UC-1, who is bilingual.  They are

not verbatim translated transcripts.  In addition to the UC-1's recorded communications, during

these undercover money laundering transactions, members of the Colombian National Police

("CNP") have intercepted the cellular phone communications of the targets of the investigation

pursuant to wiretaps lawfully authorized in Colombia.  The DEA has executed a number of

search warrants for the content of email communications from MSN Hotmail of the email addresses the targets of the investigation have used to facilitate money laundering transactions.

121.    In addition to summaries of telephone conversations, I have also included English-language summaries, as well as verbatim preliminarily translated excerpts, of pertinent email exchanges, MSN Instant Messenger conversations or "IM chats," and Blackberry Pin-to-Pin or "Pins" communications that UC-1 has had with the targets of the investigation.  Since there have been numerous telephone conversations, emails, "IM chats," and "Pins" during this more than four year undercover investigation, not every exchange has been described herein.

122.    My summaries of both the phone conversations and Internet communications, on occasion, include in parentheses, UC-1's understanding of the meaning of various coded terms used in the conversations. These parenthetical comments are based not only on UC-1's personal participation in these communications, but also his training and experience, my own training and experience, the training and experience of other law enforcement agents, and the information obtained by the investigation to date.  The times ascribed to these conversations, and all other events described herein, are approximate and unless otherwise indicated reflect the then-current time in the Eastern Time Zone of the United States.  For the most part, each of the pertinent telephone calls in which UC-1 was a participant was recorded and took place while UC-1 was in the District of Massachusetts.  The transactions summarized below are examples of several, but not all, of the undercover money laundering transactions and includes a summary of some of the recorded and intercepted communications that took place during these transactions.

1.    **January and February 2010, Undercover Pick up of Drug Proceeds in Houston, Texas**

123.    On January 14, 2010, the UC Operation picked up $551,103 in drug proceeds in the area of Houston, Texas. During the pick up operation, a Colombian male utilizing the safe code that GUERRERO provided to UC-1 arranged to meet with a DEA CS ("CS-1") in the Houston area. While DEA agents conducted physical surveillance, CS-1 meet with the Colombian male in a parking lot of sporting goods store and soon thereafter took possession of a dark colored suitcase that the Colombian male put into CS-1's vehicle. A short time later, DEA SA's Kirk Ervin and SA Lisa Johnson met CS-1 at a predetermined location, took possession of the dark colored suitcase, and found it to contain a large amount of cash. CS-1 and his/her vehicle were searched by agents prior to and after the transaction to ensure there was no tampering with the money.    About two hours after this delivery of money, a local police department canine officer and his dog "Euro" conducted a controlled experiment on the money. A sample of the money was hidden in a closed room, after a short while Euro was allowed into the room and Euro easily located the money and alerted positively to the presence of narcotics on the money. The cash, which was arranged in 55 bundles in a dark colored suitcase, was then transported to the offices of the DEA in Houston as secured as evidence. The next day, DEA agents in Houston transported the money to a Brinks facility in Houston where Brinks employees conducted an official count of the money and determined that the total count of the money was $551,103.00 dollars which included $2,300.00 in counterfeit currency. On January 21, 2010, DEA agents in Houston wired this same $551,103.00 to the DEA's undercover bank account in Massachusetts.

124.    The same day as the pick up of drug money, on January 14, 2010, at 10:51 a.m.,

UC-1 received an email from anexprox@hotmail.com, which GUERRERO had forwarded to

UC-1 entitled "*FW: Cohete*." In the email, GUERRERO wrote:

> Sir these are some of the farms (accounts) I hope you do not have any problems
> with the amounts being so low, later I will send you the rest, thank you for
> everything may God bless you always.

The email contained as an attachment a document entitled "*Pakete cohete 1-7*" which contained

wiring instructions, with specific amounts to be wired to each account, for seven different bank

accounts, numbered 1 through 7, six of which were in China and one at Bank of America in

Miami, Florida.

125.   Around the same time, during the morning of January 14, 2010, the CNP

intercepted a series of phone calls between GUERRERO and a male referred to as "Primo"

whom the CNP later identified as WYLLSEYN MARQUEZ-GOMEZ. During these calls,

GUERRERO told MARQUEZ that he had spoken to the "him" (UC-1), that the "inventory" was

"roughly 550 dozen" ($550,000) but that the "guides" (bank accounts and wire transfer amounts)

did not add up, and only provided for the transfer of $490,000 out the $550,000. As indicated

above, these intercepted phone conversations directly corresponding to the pick up of $551,103

in U.S. currency picked up in Houston, Texas the day before, and the email with bank account

and wire transfer instructions that GUERRERO emailed UC-1 the same day.

126.   At 12:36 p.m., UC-1 had an MSN Instant Messenger chat ("IM chat") with

GUERRERO. During the chat, GUERRERO informed UC-1 that he had emailed UC-1 bank

accounts to be used for the pick up in Houston, but told UC-1 to not use those accounts. During

the IM chats, instead of utilizing email address anexprox@hotmail.com, GUERRERO used a

new different Hotmail address, alfrega@hotmail.com, with a screen name of "Maximiliano":

GUERRERO:  Look I passed (emailed) you some guides to yours (accounts). But cancel them that I am going to send you others with more capacity so that you wont have to give so many orders.

UC-1:  I received your email, and you understand that it takes about 5 days to cross the lake.. and you know how the dragons are (Chinese).

GUERRERO:  No but cancel those . . . I will send you others now.

127.  Later during the evening of January 14, 2010, at 7:57 p.m., UC-1 received an email from anexprox@hotmail.com entitled "New Coordinates." The email contained as an attachment a document entitled "*Pakete Cohete 1-9*" which included wiring instructions for nine different bank accounts, including specific dollar amounts for each wire transfer, for banks in China, Hong Kong, and the United States.

128.  On January 15, 2010, during an IM chat with GUERRERO at 9:28 a.m., GUERRERO informed UC-1 that after the wire transfers, there would be some money left over. GUERRERO said he would email UC-1 instructions for another bank account, and asked about the status of the wire transfers.

129.  At 10:59 p.m., UC-1 received an email from anexprox@hotmail.com which read:

Sir the first orders that I sent you add up to a total of 494.160 there are 5.840 left to complete the 500.000 dozens please to any of the ones I gave you prior place the 5.840 and this one that I send you here please send 25.000 left for a total of 525.000. Sir thanks a lot for everything if anything I will continue on online in case, God Bless and protect you.

ATT your friend Fernando

The email contained as an attachment wiring instructions for an account 

UC-1 that the $30,000 represented his point or commission for the money laundering transaction.

130.    At 1:25 p.m., UC-1 placed a call to GUERRERO.  During the call, UC-1 told GUERRERO in a coded manner that the total amount of money collected was $551,103, but that it contained about $2,000 in counterfeit bills.  GUERRERO thanked UC-1 and told UC-1 that he would be reporting that amount.

131.    On January 20, 21, 22, and 28, 2010, from an undercover bank account in Massachusetts, the DEA wire transferred a total of $528,878 (the total amount of drug money minus UC-1's flat rate "commission" of $20,000 and minus the counterfeit bills in the total amount) in a series of wire transfers to twelve different bank accounts, including ten in the United States, one in China, and one in Panama.  Among these wire transfers, on January 21, 2010, the DEA wire transferred $30,000.00 out of the $551,103 in drug money picked up in Houston on January 14, 2011 ███████████ According to GUERRERO, the $30,000 that the DEA wire transferred to ███████ represented GUERRERO's commission for the money laundering transaction.

132.    After the first set of wire transfers, on January 22, 2010, at 11:24 a.m., UC-1 sent the following email to GUERRERO at anexprox@hotmail.com:

> Brother, here are the exits (outgoing wire transfers), included are the ones I sent yesterday. In total 266,460 has left. I still have not received the new one you sent me.  There are 232443 that includes the 50 of com (commission).

At 12:16 p.m., UC-1 sent the following email to GUERRERO at anexprox@hotmail.com: that read ████████████████████████████ '  As part of these emails, UC-1 included as an attachment a wire transfer confirmation for a wire transfer of $30,000 from an undercover bank account in Massachusetts to ███████████

**2.     January 25, 2010, Pick up of $299,810 in Drug Proceeds in Houston, Texas**

133.     After this first pick up of drug proceeds in Houston, on January 25, 2010, the UC

Operation picked up $269,695 in drug money.  During the transaction, a Colombian male

identified as Jose Cairo Estupinan delivered a black and blue soft sided insulated cooler to a

DEA CS in the presence of DEA SA████████ who was acting in an undercover capacity,

in the parking lot of a Fiesta Market in Houston, Texas.  The insulated cooler was later found to

contain numerous bundles of cash wrapped in black plastic and totaled $269,695.

134.     On January 28, 2010, GUERRERO emailed UC-1 wire transfer instructions to

banks (with specific amounts) in California, New York, Florida, and Panama.  In the email,

GUERRERO told UC-1 that these wire transfers instructions were for the "second delivery" of

drug proceeds in Houston in addition to $20,000 in additional money from the first pick up of

drug money on January 14, 2010, that still had not been wired.  In the same email, GUERRERO

also told UC-1 to wire transfer a percentage of the money (representing GUERRERO's

commission) "to the one in Panama that we are having a problem with the Man" (referring to

████████.  In particular, GUERRERO wrote:

> Sir there I have sent you this packet to square the second delivery and there I
> also accommodated the left over 20 ($20,000) of the last. Send the
> percentage to the one in Panama that we are having a problem with the Man.
> Thank you for your attention and please help me with the one stuck in PABA.
> Wishing you success in your day, I bid good bye God Bless you Sir.

Following these instructions, on January 29, 2010, the DEA wired $14,484.00 to████████

████████████████████████ from an undercover

account in Massachusetts.

135.     On February 24, 2010, picked up $299,810 in drug money in the Houston, Texas

area. During the transaction, an unidentified Colombian male referred to as "Camilo" delivered a

black duffle bag to a DEA CS in a parking lot in Houston that was later found to contain

$299,810 wrapped in clear plastic wrap. Before the transaction, the unidentified male who

delivered the bag, "Camilo," said that the "check" was going to be for "300" ($300,000).

136.    On February 28, 2010, at 5:19 p.m. UC-1 received an email from GUERRERO at

anexprox@hotmail.com that read as follows:

> From: anexprox@hotmail.com
> To: ▮▮▮▮▮▮▮▮▮
> Subject: FW: ▮▮▮▮▮▮▮
> Date: Sun, 28 Feb 2010 17:19:13 -0500
>
> Sir these are the farms (accounts) to send the request from the H (Houston)
> sir they are going complete. (All money from pick up destined to this
> account)

Attached to the email was a document with the wiring instructions for ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

The original email appeared to have been forwarded to GUERRERO on February 24, 2010, from

email address bambinotio@hotmail.com. In the text of the email, the user of

bambinotio@hotmail.com wrote, *"Send it all to this account."*  In later recorded

communications with UC-1, GUERRERO told UC-1 that the user of the "bambinotio" email

account was the owner of the account.

137.    On March 1, 2010, at 7:43 p.m., UC-1 engaged in an IM chat with GUERRERO.

During the chat, GUERRERO told UC-1 that the owner of the money picked up in Houston was

asking about the status of the wire transfers to the accounts that GUERRERO provided UC-1.

UC-1 said that he did not want to rush the process at the bank, but would complete them as soon

as possible and would provide GUERRERO with the wire transfer confirmations.

138.   Following these instructions, as further detailed in **Attachment B,** on March 2, 2010, the DEA wire transferred $60,000.00 to ███████ and on March 3, 2010, sent two separate wire transfers in the amount of $112,410.00 and $90,000.00 to ███████ After sending these wire transfers, during an IM chat at 12:07 p.m., GUERRERO again asked UC-1 about the status of the transfers and said that he was receiving pressure from the owners of the money  A short time later at 12:20 p.m., UC-1 emailed GUERRERO a confirmation from Eastern Bank in Massachusetts for the wire transfer of $60,000.00 to ███████ In the text of the email, UC-1 wrote, *"Brother, sorry but the only thing that has arrived is the confirmation of the parts that are getting out, here I am sending you this one. I am on that with the Bank, sorry about the delay, but you know that with me it will arrive since we attend everything carefully. If you need it I will tell the man over the phone."*

139.   Later that same day, on March 2, 2011, at around 5:20 p.m., UC-1 engaged in an IM chat with GUERRERO regarding the availability of 800 kilograms of cocaine available for sale in Panama.. GUERRERO referred to the 800 kilograms of cocaine as *"lote de 800 metros"* (lot of 800 meters), and stated that each "metro" (kilogram) was priced at $4,200 per kilogram, but being priced at 4200 ($4,200.00) and that the quality was 96% pure.  UC-1 said that he had just closed on a deal with his friend, but that he would see if he could find a client.  UC-1 also asked GUERRERO if there was anyway to obtain a "foto" (a sample of the cocaine).  (In a subsequent IM chat days later on March 4, 2010, UC-1 confirmed with GUERRERO that the substance they were talking about was cocaine, which GUERRERO referred to as *"fabricas blancas finas"* (fine white fabric)).  At the end of the IM chat, UC-1 said that the wire transfers

would be resolved today.   Later that same evening, during an IM chat at 8:22 p.m., UC-1

informed GUERRERO that the second and third transfers ██████████would go out tonight

from different accounts that UC-1 had.   The next day, on March 3, 2010, at 11:18 a.m., UC-1

emailed GUERRERO the wire transfer confirmations for the transfer of $112,410.00 and

$90,000.00 to ████████  The wire transfer confirmations attached to the email, which

GUERRERO forwarded to bambinotio-hotmail.com, again indicated that the wire transfer

originated from a bank in "East Boston, MA."

140.    On March 4, 2010, at 10:03 a.m., UC-1 had an IM chat with GUERRERO during

which GUERRERO told UC-1 that the wire transfers had not arrived at ██████████n

Panama.   UC-1 reminded GUERRERO that the money had to first go through the intermediary

bank in New York, JP Morgan Chase, and told GUERRERO that the last transfer they did (to

Florida) had already arrived because the account was in the United States.   UC-1 then suggested

that the owner of the accounts i██████████ould request a trace of the funds at ██████████

and asked GUERRERO for contact information for the owner of the account at██████████

████████

141.    During an IM chat on March 5, 2010, 9:43 a.m., GUERRERO informed UC-1 and

that the wire transfer had arrived a█████████ but had not been put into the█████████

account because the wire transfer instructions were missing the address of the final beneficiary.

GUERRERO asked UC-1 to resend instructions with th██████████████████

██████████████████████████████████████████

██████████████  UC-1 advised that he would do so, but that it would take about 48

hours to get the money released fro████████o resend the wire transfer.

142.     During an IM chat on March 8, 2010, at 10:59 a.m., GUERRERO told UC-1 that

he was with the friend who controlled the Houston contract who was asking whether the wire

transfer had been corrected and asked for a copy of the correction message.  Later that same day,

at 3:53 p.m,. UC-1 sent an email to GUERRERO with copies of the correction message sent

from Eastern Bank in Massachusetts to ███████████ to correct the final beneficiary address

for the wire transfers to the ████████████████.  In the text of the email, UC-1

wrote, '███████████████████████████████████

███████████████████████'  After receiving this email from UC-1, an

email search warrant revealed that the same day that GUERRERO received this email from UC-

1, GUERRERO forwarded UC-1's email to bambinotio-hotmail.com.

143.     During an IM chat on March 12, 2010, at 5:53 p.m., GUERRERO told UC-1 that

the man had spoken to the woman from ███████ who had requested information to complete the

wire transfer to ██████ C-1 told GUERRERO that he had provided all the information to

"Ignacio" including all the correction messages for the wire transfers.

144.     On March 16, 2010, at 4:41 p.m., UC-1 sent an ████████████████████



████████████████████████████The same day, during an IM chat with

GUERRERO at 5:25 p.m., UC-1 confirmed with GUERRERO that he received the email that

UC-1 had sent to GUERRERO, ██████████████████████████UC-1 also

asked GUERRERO if ████████████████████████████████████████

████████████ as someone who could be trusted. GUERRERO responded that ████████

was a ████████████████████ who managed his accounts. The next day, on March

17, 2010, during an IM chat with GUERRERO at 3:48 p.m., GUERRERO informed UC-1 that

the wire transfers that UC-1 had previously sent to ████████ that could not be processed because

they did not have a final beneficiary address for ████████ had been returned to UC-1's

account. UC-1 asked GUERRERO if he wanted UC-1 to re-send the funds to the same accounts

at Banesco or if GUERRERO would provide UC-1 different bank accounts. GUERRERO said

that he would provide UC-1 with different bank accounts. Thereafter, on March 19, 2010,

GUERRERO sent UC-1 a series of emails which containing wire instructions for three different

bank accounts in the United States.

**B.** **Recorded Communications Between GUERRERO and UC-1 About Cocaine in Houston, Texas and May 20, 2010, Seizure of 238 Kilograms of Cocaine**

145.     In May 2010, UC-1 had several recorded calls and IM chats with GUERRERO in

which GUERRERO indicated to UC-1 that there were hundreds of kilograms of cocaine

available for sale in the Houston, Texas area. For example, on May 5, 2011, at around 12:00

noon, UC-1 placed a recorded call GUERRERO at phone number 301-558-2908. During the

call, GUERRERO spoke to UC-1 in a coded manner about a shipment of cocaine that would be

coming available in the Houston area. GUERRERO told UC-1 that his uncle "Humberto"

(Houston) had about 121 "mesitas" (tables-code for kilograms of cocaine) available of fine

material. GUERRERO asked UC-1 to speak to his friend (that UC-1 told GUERRERO in earlier

conversations that UC-1 had who could purchase the cocaine) to see if he may be interested in

that and in assisting them with the same service (laundering the money after it was sold).

GUERRERO stated that he has not received the price per *mesita* (kilogram of cocaine) but that he was hopping to get them cheap and assured the quality of the *mesitas* (cocaine).

146.    On May 20, 2010, law enforcement agents from the U.S. Coast Guard, ICE, and Customs and Border Protection seized 238 kilograms of cocaine off a Colombian Motor-vessel "Parnaso." According to statements that one of defendants gave, Esneider Hidrobo, the cocaine was transported from Venezuela to Corpus Christi, Texas.[1] After these seizure, GUERRERO informed UC-1 that there had been a problem that prevented the cocaine from being available to sell to UC-1. Specifically, on June 2, 2010, at around 1:51 p.m., UC-1 engaged in an IM chat with GUERRERO over the internet. During this chat, UC-1 told GUERRERO that UC-1 had heard from an associate in "Humberto" (Houston) that "the furniture store closed and they lost 200 furniture (200 kilograms of cocaine were seized) in *"monta cristi"* Corpus Cristi (mona cristi) UC-1 asked GUERRERO if these were the ones (cocaine load) GUERRERO was on and GUERRERO replied, "yes sir, correct."

## C.    Colombian Casa de Bolsas: Cia de Profesionales de Bolsa and Corredores Associados

### 1.    Money Laundering Pick Ups in Los Angeles, California.

147.    Beginning in April 2010, the UC Operation began picking up drug money in Los Angeles, California. Following these pick up s, GUERRERO instructed UC-1 to wire more than $918,000 of this drug money to accounts in the United States at Wachovia, Citibank, and Deutsche Bank under the names of two different exchange/brokerage houses in Bogota,

---

[1]The agents in this case had no involvement in the seizure. Instead, the basis of knowledge from this seizure of cocaine is derived from a report about the May 20, 2010, seizure and the public docket from the criminal case that followed in the Southern District of Texas in *United States v. Hidrobo et al*, 10-cr-00595.

*Profesionales Casa de Bolsa* and *Corredores Asociados.* The investigation would later reveal,

through an undercover meeting in Bogota, that a male referred to as "Don Andres" (who was

later identified as ANDRES COVELLI CADAVID) provided these accounts to GUERRERO and

that COVELLI was a "person of confidence" who laundered large sums of money for

GUERRERO and GUERRERO's partner, NELSON ALVARO ARTEAGA-ESPINOZA, a.k.a.

"Pastuso" through Colombian these *casa de bolsas* and various companies that COVELLI

operated in Colombia.

148.    On April 15, 2010, at 1:04 p.m., UC-1 received a call from GUERRERO.  During

the call, GUERRERO asked UC-1 about the "pretty girls that looked like angels" (referring to

Los Angeles, California) and asked UC-1 if he had a way of getting in touch with them (if UC-1

had someone in Los Angeles who could conduct the pick up ).  UC-1 answered that he could

make arrangements to do some "site seeing" (referring to the ability to pick up) with them (pretty

girls).  UC-1 and GUERRERO arranged to speak further over the internet and GUERRERO

asked UC-1 if he could pass along a phone number for someone in Los Angeles (to pick up  the

money) since they had "four hours" ($400,000) for work in that area.

149.    On April 15, 2011, at 1:23 p.m., UC-1 placed a call to California phone number

(323) 253-0666 and spoke to male with a Mexican accent who identified himself as "Oscar."

During the brief call, UC-1 provided the safe code of *"Cabullin de parte de Gato."* UC-1 told

"Oscar" that his worker (another UC agent) would calling him and that his name was "Juansillo."

Shortly after this, a City of Baldwin Park, California Police Officer working with DEA, Det.

██████████ called "Oscar" at this same number and provided the same safe code.  During the

brief call, Det. Leon said he would meet Oscar tomorrow.  Oscar responded that was good

because he was "still waiting to receive the rest." The next day, on April 16, 2010, ███████

met with Oscar in the parking lot of a Wal-Mart in Baldwin Park, California. During the

transaction, "Oscar" put cardboard box for a stereo system into the back ███████ vehicle and

told ███████ "there's 245 in the box." After taking possession of the box, ███████

transferred custody of the box to the DEA which later counted and determined to be

$244,760.00 in U.S. currency.

150.     After the actual delivery of the box, at 2:26 p.m. (EST), UC-1 called "Oscar" at

(323) 253-0666 and told "Oscar" that they were expecting to receive $400,000. "Oscar"

answered that he was told by his bosses to deliver $245,000. At 2:45 p.m., UC-1 called

GUERRERO and in a coded manner told him that his guy met with the man in Los Angeles

"looked at the apartment and it was only 245 feet" ($245,000) not the "400 feet" he was

expecting ($400,000). GUERRERO said that he will check and see what happened and asked if

they were going to deliver more. GUERRERO said he would get back to UC-1.

151.     Following the pick up of drug proceeds, on April 16, 2010, GUERRERO sent an

email to UC-1 entitled "instructions." In the text of the email, GUERRERO wrote, *"Good day

sir here I send you the wire transfer instructions for todays operation."* The text of the email

included wire transfer instructions for two bank accounts at Wachovia in New York under the

name of two different exchange/brokerage houses in Bogota, Colombia, with the same final

beneficiary. The first account was an account under the name *CIA DE PROFESIONALES DE

BOLSA,* with a final beneficiary of *COMERCIALIZADORA INTERNACIONAL FERAN LTDA,*

Nit: 900.025.457-5, CRA 16 96 64 OF 205 Bogotá – Colombia. The email indicated a transfer

amount of $155,600.00 and that the wire transfer should contain the reference,

*"COMERCIALIZADORA GALANI C.A., payment for invoices 68 and 69."* The second account

was under the name *CORREDORES ASOCIADOS S.A.*, with the same final beneficiary,

*COMERCIALIZADORA INTERNACIONAL FERAN LTDA*, Nit: 900.025.457-5, and a transfer

amount of $44,000.00

    152.    On April 20, 2010, following GUERRERO's instructions, the DEA wire

transferred $155,600 to the Wachovia Accounts under the names *CIA DE PROFESIONALES DE*

*BOLSA* and $44,400 to the Wachovia Account under the name *CORREDORES ASOCIADOS*

*S.A.* The 44,440 wire transfer was returned the next day to the DEA's undercover bank in

Massachusetts because the account at Wachovia had been recently closed. After informing

GUERRERO about this account being closed, on April 21, 2010, UC-1 forwarded an email from

GUERRERO that contained wire instructions for another account under the name

*CORREDORES ASOCIADOS S.A.* at Citibank. The instructions in the email read as follows:

      BANCO : CITIBANK NY
      ABA : 0 2 1 0 0 0 0 8 9
      CUENTA NUMERO ▉▉▉▉▉▉▉
      NOMBRE DE LA CUENTA: CORREDORES ASOCIADOS S.A.
      BENEFICIARIO FINAL: CI FERAN LTDA
      Nit: 900.025.457-5 Cr 16 96 64 of 205

The email further contained a notation that read: *"The operation of these US $44.400 that was*

*sent to Wachovia most certainly will be returned to you at the account of origin, please send that*

*operation again to the account at Citibank of CORREDORES ASOCIADOS S.A., Cordially,*

*Mary Pardo."*

    153.    After executing the wire transfer, the same day, UC-1 emailed GUERRERO the

wire transfer confirmations that indicated the transfers originated from a bank in Massachusetts.

An email search warrant later revealed that after receiving these emails from UC-1, GUERRERO

forwarded these wire transfer confirmations to email address bambinotio-hotmail.com.

154.    Following these instructions, on April 21, 2010, the DEA wire transferred $44,400.00 to the new *CORREDORES ASOCIADOS* Account at Citibank, Account No. ███████("CITI-4795"), under the name *CORREDORES ASOCIADOS S.A.*, with the same final beneficiary, CI FERAN LTDA Nit: 900.025.457-5.

155.    Thereafter, on April 22, 2010, Det. Leon in Baldwin Park, California received another phone call from "Oscar" about the delivery of an additional quantity of drug proceeds. In this call, "Oscar" told Det. Leon that he thought he was being followed by the police and asked Det. Leon if he could meet with his friend "Carlos" instead. Det. Leon then called "Carlos" that "Oscar" gave him and arranged to meet "Carlos" in the parking lot of a local Target store. In the parking lot, "Carlos" gave Det. Leon two cardboard boxes containing U.S. currency. "Carlos" said one box contained $55,000 and other had $195,000. After taking possession of the box, Det. Leon transferred custody of both boxes to DEA SA Eric Neal which was later counted and determined to be $251,640.00 in U.S. currency.

156.    On April 26, 2010, GUERRERO sent an email to UC-1 with the wire instructions for $251,640 that the UC Operation picked up in Los Angeles on April 22, 2010.   After sending the email, GUERRERO called UC-1 to inform him that GUERRERO had just sent UC-1 the *"bodegas"* ("the stores," bank accounts).   In the email, GUERRERO instructed UC-1 to wire $167,700 into the same Wachovia Account described above under the name *CIA DE PROFESIONALES DE BOLSA*, with a final beneficiary of *COMERCIALIZADORA INTERNACIONAL FERAN LTDA*, Nit: 900.025.457-5, CRA 16 96 64 OF 205 Bogotá – Colombia. (According to records from Wachovia, this account was closed on May 4, 2010). In

the same email, GUERRERO instructed UC-1 to wire the remaining funds to **CITI-4795**.

157.    On April 27, 2010, following GUERRERO's instructions, the DEA wired

$167.600.00 to the (now closed) Wachovia Account under the name *CIA DE PROFESIONALES*

*DE BOLSA*, and $73,974.40 (representing the remainder of the drug money picked up in Los

Angeles minus UC-1's 4 percent commission) to **CITI-4795**. Following the transfers, UC-1

again emailed the wire transfer confirmations to GUERRERO which GUERRERO in turn

forwarded to ARTEAGA's email address, bambinotio-hotmail.com.

## 2.    Money Laundering Pick Ups in New York

158.    On June 17, 2010, the UC Operation picked up $200,000 in drug proceeds in

Long Island, New York. The next day, on June 18, 2010, GUERRERO sent UC-1 an email with

the wire transfer instructions. In the text of the email, GUERRERO wrote, *"Sir this is the store*

[bank account] *please in two pieces* [wire transfers] *one of 95 and the rest on the other, many*

*thanks for your help and god bless you."*  As further described below, during an undercover

meeting in Bogota on January 21, 2011, COVELLI told UC-1 that a compliance officer at the

*casa de bolsa* told COVELLI to make sure the wire transfers were under $100,000 in order to

avoid scrutiny from U.S. regulators and law enforcement. The text of the email also contained

the following wire transfers instructions for the following bank account (**"DBTC-4296"**):

> DEUTSCHE BANK TRUST COMPANY AMERICAS
> 60 Wall Street New York, NY 10005 NEW YORK
> ABA: 021001033
> SWIFT: BKTRUS33
> Account No. ████
> Account Name: *Compañía de Profesionales de bolsa*
> Beneficiary: *COMERCIALIZADORA INTERNACIONAL FERAN LTDA*
> Nit: 900.025.457-5.
> *REFERENCIA DEL GIRADOR* (COMERCIALIZADORA CEGHER PARTS)

The email further indicated that the amount of the wire transfer would be $100,000.

Furthermore, as indicated above, the final beneficiary of the wire transfers was listed as being

"COMERCIALIZADORA INTERNACIONAL FERAN LTDA."[2]   As further described below,

during an undercover meeting with COVELLI and GUERRERO in Bogotá on January 21, 2011,

COVELLI indicated that he used several companies in Colombia to launder the funds through

these bank accounts.  In addition to these transactions, in later transactions both to the

Professionales account (DBTC-4296) and the Corredores account (CITI- 4795) the same

company, COMERCIALIZADORA INTERNACIONAL FERAN LTDA, was used as a final

benefificary.  Following these instructions, on June 21, 2010, the DEA executed two wire

transfers to **DBTC-4296,** one in the amount of $95,000.00 and the second in the amount of

$97,000.00.

159.    On June 29, 2010, July 9, 2010, and July 27, 2010, the UC Operation picked up a

total of $437,855 in drug proceeds in the Bronx in New York City. After these pick up s,

GUERRERO again instructed UC-1 via email to wire transfer the funds to **DBTCO-4296.**

Following these instructions, on July 1, 2010, following GUERRERO's instructions, the DEA

wire transferred an $95,971.20 to **DBTCO-4296**; and on July 12, 2010, executed two wire

transfers in the amounts of $13,200.00 and $215,184.00 to **DBTCO-4296** from an undercover

account in Massachusetts.

**D.     Recorded Undercover Meetings in Bogotá, Colombia**

    **1.      December 11, 2010, Undercover Meeting with GUERRERO and GOMEZ in**

---

[2]According to members of the Colombian National Police, the "NIT" number listed above, 900.025.457-5, is a kind of tax-ID number for the company, *COMERCIALIZADORA INTERNACIONAL FERAN LTDA.*

**Bogota, Colombia**

160.     On December 11, 2010, UC-1 engaged in an undercover meeting with GUERRERO and a male later identified as JUAN CARLOS GOMEZ-PRECIADO, a.k.a. "Camilo,"at the JW Marriot Hotel in Bogota, Colombia. UC-1 met GUERRERO in the hotel lobby and immediately recognized both his voice from numerous recorded phone calls and his face from photographs of GUERRERO.  GUERRERO greeted UC-1 and introduced UC-1 to another Colombian male that was with GUERRERO, GOMEZ. The meeting was recorded through both audio and video.

161.     During the first part of the meeting, GUERRERO talked to UC-1 about some problems their were having with a pick up  of money in Guatemala.  Prior to this meeting, GUERRERO had asked UC-1 about picking up money in both Guatemala and Puerto Rico. GUERRERO explained that the people who had made the request to pick up  the money in Guatemala were the same ones who needed money picked up in Puerto Rico.  GUERRERO confirmed with GOMEZ that the amount in Puerto Rico that needed to be picked up was "900" ($900,000), and that these people were waiting for UC-1.  (On January 4, 2011, the DEA picked up $486,667 in San Juan, Puerto Rico for GUERRERO).  Later in the conversation, GUERRERO also told UC-1 that the same group of people were very serious and had previously delivered money to UC-1 in Chicago and Atlanta. (Between July and September, 2010, the DEA picked up more than $1.3 million in Chicago and Atlanta).  GUERRERO further explained that these people operate by bringing it (the drugs) through Mexico and then up to Chicago and Atlanta.  UC-1 responded that he understood because during those pick up s UC-1 got calls from Mexico and that there was confusion about whether the "20 boxes" that UC-1 was receiving was

- 74 -

money or "work" (drugs). GUERRERO further said that these people were happy with how things turned out in Atlanta and Chicago and how GUERRERO paid them in Colombia.

162.    Later in the conversation, GUERRERO and UC-1 talked about some of the problems that arisen with cocaine seizures in Italy and Corpus Christi, Texas. UC-1 told GUERRERO that he did not remember the issue with Corpus Christi. GUERRERO turned to ARTEAGA to confirm his name, and GUERRERO said it was "Fernando"/"Fercho" who lost the shipment of drugs in Corpus Christi and also said that the same "Fernando"/"Fercho" had also lost two shipments of drugs off some little islands close to Puerto Rico. UC-1 also mentioned to GUERRERO that he had lost some "contracts" to launder money to other individuals who were charging a smaller percentage fee. UC-1 said that it was particularly difficult for him where he was living in the Boston area. UC-1 also talked to GUERRERO about the money pick up  that UC-1 conduct for the man in Puerto Rico (GUADALUPE) who was in control of the "business." GUERRERO confirmed that the understood what UC-1 was talking about a said that there was an association between the person in Puerto Rico (GUADALUPE) and some individuals in Medellin and Cucuta, Colombia. GUERRERO then told UC-1 that because of a seizure of about 400 million pesos in Bogota last year (about $200,000) GUERRERO had not been working for about a year, but now receiving many contracts to launder money. Later in the conversation, GUERRERO said he punished for losing this money and had to liquidate some of his assets in order to pay the debt. GUERRERO said that one of the organizations that GUERRERO was laundering money for was shipping drugs to Guatemala every days, and that some of this cocaine was destined for *"la rueda"* (Chicago). GOMEZ confirmed this and also said that this organization had an eight day cycle (transporting cocaine every 8 days). Later on, UC-1

explained that it was difficult to receive phone calls "out of the blue" to pick up money. UC-1 said it would be better if UC-1 could meeting directly with people who have decision making authority and are not just delivery a bag ahead of time so they could work out a schedule (to pick up the money) and get organized. GOMEZ responded that the he understood and said that he has explained this to the "customers" (drug traffickers), but that they are very stubborn and want it down their way.

163.    UC-1 then talked to GUERRERO and GOMEZ about the need to create paperwork (false documentation) in case there is any questions from the banks. UC-1 specified that he has had problems with "JP Morgan" in the past and GUERRERO and GOMEZ said that they had also had problems with JP Morgan because JP Morgan moves money all around the world. GUERRERO then said that during the most recent pick up s, they have been using the accounts at the *Casa de Bolsas* and said that you can push through anything you want through them. GUERRERO said that he just needed to tell them (the casa de bolsa) how much he was going to push through in advance to so they could be ready and do their thing. GUERRERO said that these accounts were better than the ones that "Don Eduardo" (EDUARDO PABUENCE) was using and said the "association" (*la Oficinia de Envigado*) was upset with Eduardo because during one transaction they thought he was playing with the money in Panama (waiting to transfer the money in order to make a profit on the currency exchange). GUERRERO also said that he was no longer working with "Carlos" (ZAMBRANO) because he took 10-15 days to launder the money, where UC-1 took only 2-3 days). Later in the conversation, GUERRERO also mentioned that they also handle issues relating to the collection of debts for the "company" in Medellin (*la Oficinia*), including one instance when GUERRERO had to "bring down"

someone who was responsible for a seizure of drugs in Miami.

164.    Toward the end of the meeting, GUERRERO said that he had been working with GOMEZ for the past year, and that they felt comfortable in the manner in which UC-1 operated. UC-1 also talked to GUERRERO about obtaining kilograms of cocaine for another client of UC-1 who was interesting in purchasing 500 to 1,000 kilograms of cocaine in Colombia at Colombian prices, instead of a price that GUERRERO had offered UC-1 for sale in the United States where the cocaine would ultimately be sold.   GUERRERO assured UC-1 that he could provide people who supply that much cocaine. GUERRERO also asked UC-1 to get ready for some picks up in Puerto Rico which would be on the behalf of a client named "Don Jorge."

**2.    January 21, 2011, Undercover Meeting with GUERRERO, ARTEGA, a.k.a. "Pastuso," and COVELLI, a.k.a. "Don Andres," in Bogota, Colombia and Controlled Delivery of Cocaine on February 23, 2011**

165.    As described above, beginning in April 2010, GUERRERO began instructing UC-1 to wire transfer drug money into the U.S. bank accounts of two large Colombian *casa de bolsas*, *CIA DE PROFESIONALES DE BOLSA* and *CORREDORES ASSOCIADOS S.A.*   In later recorded conversations and meeting, GUERRERO informed UC-1 that these accounts were controlled by "Don Andres."  GUERRERO explained that "Don Andres" had a relationship with these *casa de bolsas* and was able to launder drug money through these accounts by receiving U.S. dollars into the accounts, created some kind of debt in one of several companies "Don Andres" managed in Colombia, and then paid out the money (minus "Don Andres" own percentage fee) in Colombia pesos.  As further described below, "Don Andres" was later identified as ANDRES CADVID COVELLI.

166.    On January 21, 2011, UC-1 together with the same DEA confidential source

described above ("CS-1"), who was posing as UC-1's South American banking consultant, engaged in a undercover meeting with GUERRERO, ALAVRO ARTEGA, a.k.a. "Pastuso," and a third individual then known as "Don Andres."  "Don Andres" was later identified as ANDRES CADVID COVELLI.  Prior the meeting, UC-1 inquired of ROLO if UC-1 could use the accounts that the casa de bolsa (*CIA DE PROSEIONALES DE BOLSA* and *CORREDORES ASSOCIADOS S.A.*) for the laundering of drug money of a "client" of UC-1's.  ROLO agreed and arranged a meeting and an introduction to a Colombian male then only known as "Don Andres."  The meeting took place a hotel in Bogota, and was recorded by UC-1 through both video and audio recorded.  The following is a brief summary of some, but not all, of the topics discussed during this meeting.

167.    During the meeting, GUERRERO introduced COVELLI as the man in the charge of the *"bodegas"* (stores, the accounts) and said that COVELLI was the one who manages the accounts.  UC-1 then proceeded to explain to COVELLI that UC-1 had some clients that had to move large amounts of money, and that UC-1 noticed that the accounts that GUERRERO had been providing to UC-1 recently, the casa de bolsa accounts, were moving without problems and with good volume.  UC-1 said that he wanted to talk to COVELLI directly because UC-1 needed to understand the number of days that it would take COVELLI to move the money as well as the cost.

168.    After listening to UC-1's questions, COVELLI explained that he was able to "monetize" funds in Colombia through various businesses he manages in Colombia. COVELLI said that since he works inside the casa de bolsa, and has able to receive U.S. dollars in the casa de bolsa accounts in the United States and then through various business in Colombia, was able

to pay out a corresponding amount of Colombian pesos in either cash, check, or multiple checks in Medellin, Colombia. During the actual transactions, COVELLI said he would provide the information to whom the money would be credited in the wire transfer (for example in the reference section of the wire transfer), but that the actual check would not be cut in the same name (as in the name of a business), but that a cost would be created in some other business that COVELLI controls to justify the pay out.

169.    Later in the conversation, UC-1 told COVELLI that one of his clients had asked UC-1 to receive "20 containers" (to launder $20 million), but that UC-1 did not have the mechanism to handle that kind of money. COVELLI said he understood and warned that in this business, you do not want to be in the sun that shines the most, but that in order to deal with volume of funds, COVELLI would spread out the transactions over a series of *casa de bolsas*. COVELLI specified that he was using ten businesses and three *casa de bolsas* in Colombia to move the funds for UC-1. Two of the *casa de bolsas* that COVELLI named to UC-1 were *CIA DE PROFESIONALES DE BOLSA* and *CORREDORES ASSOCIADOS* (the same casa de bolsas into whose accounts the DEA wired drug money on GUERRERO's behalf). COVELLI also said that depending on the volume (of money) that UC-1 had, COVELLI could provide UC-1 up to ten different *casa de bolsa* bank accounts in the United States. Thereafter, UC-1 asked COVELLI how much each account could hold (in terms of dollar amounts). COVELLI replied that he had been studying the Patriot Act and that the *"official de cuplimientos"* (compliance officer) had told COVELLI to stay under $100,000 (to keep the wire transfers) under $100,000 because anything over $100,000 is being scrutinized by the American Government (After the first round of wire transfers into *PROFESIONALES* account in Wachovia, which was soon

thereafter closed, each of the wire transfers were in amounts just below $100,000).

170.    Later during the same meeting, UC-1 engaged GUERRERO in a conversation about the purchase of a sample of cocaine for another one of UC-1's clients for the ultimate purchase of a larger quantity of cocaine.  Before doing so, however, UC-1 asked GUERRERO if it was ok to speak with GUERRERO about this topic in front of "Don Andres."  GUERRERO replied that COVELLI was a person of "confidence" and that they could speak clearly. GUERRERO then proceeded to explain, in Don Andres's presence, that he had two different connections for cocaine, one that could produce as much as 400 to 500 "cosos" (kilograms) per week, and another that could produce between 4,000 and 5,000.  GUERRERO stated, however, that the people who produce the "merchandise" do not provide transportation beyond the point of departure. A short time later, GUERRERO explained that the he worked for the *"la Oficina"* in Medellin, who was at war with a different group in Medellin for the past two years.  But GUERRERO explained that his group now had the backing of Cali and that they would win this war once and for all.

171.    On February 23, 2011, another DEA CS ("CS-3") met with GUERRERO inside the San Fernando hotel in Medellin, Colombia. The purpose of the meeting was for GUERRERO to provide CS-3 a kilogram sample of cocaine. The meeting and the delivery of the cocaine was recorded in the hotel room.  GUERRERO and GOMEZ delivered the kilogram "sample" of cocaine.  Prior to the meeting, following GUERRERO's directions, UC-1 wire transferred to $2,714.36 to the name that GUERRERO provided, Juan Carlos Gomez-Preciado, which included GOMEZ's cedula number. From this, the CNP were able to obtain a photo identification of GOMEZ which revealed that GOMEZ was "Camilo," the same person with whom UC-1 met on

December 11, 2010, and CS-3 met on February 23, 2011.

### 3. Undercover "Sting" Transfers to COMPANIA DE PROFESIONALES DE BOLSA (DBTC-4296) and CORREDORES ASOCIADOS (CITI-4795)

172.     Following the undercover meeting on January 21, 2011, UC-1 arranged to wire

official U.S. government funds that UC-1 "represented" to COVELLI, GUERRERO, and

ARTEAGA was the proceeds of narcotics trafficking.  As described above, UC-1 explained that

he was interesting in using the system that COVELLI had in place with the *casa de bolsa* account

on behalf of a "client" who wanted to launder "20 containers" ($20 million), but first wanted to

test to "system" before wiring larger sums of drug money to COVELLI, GUERRERO, and

ARTEAGA.

173.     Following the instructions that both GUERRERO and COVELLI provided to UC-

1, the DEA executed a series of wire transfers in official government funds to both **DBTC-4296**,

under the name *COMPANIA DE PROFESIONALES DE BOLSA* and **CITI-4795**, under the name

*CORREDORES ASOCIADOS S.A.*   COVELLI specifically instructed UC-1 to ensure that the

transfers would be broken up into multiple transfers, over several days.  As further described in

**Attachment C,** on April 26, 2011, from an undercover account in Massachusetts, the DEA wired

$65,000 and $91,000 to **DBTC-4296** and $88,500 to **CITI-4795**.  Two days later, on April 28,

2011, the DEA wired $65,216 to **DBTC-4296**, $86,000 to **CITI-4795** and $4,000 to **BAN-7601**,

the *Mundo Diesel* account at Banesco Bank in Panama.  According to GUERRERO, the $4,000

wire transfer to **BAN-7601** represented GUERRERO's "point" or commission for the money

laundering transaction.

174.     On May 4, 2011, UC-1 again met with GUERRERO and GOMEZ in Bogotá,

Colombia in a meeting that was recorded through both audio and video.  The purpose of the

meeting was for UC-1 and a DEA Confidential Source ("CS-3"), who was posing as one of UC-1's drug trafficking clients, to receive Colombian pesos from GUERRERO that "Don Andres" (ANDRES COVELLI CADAVID) had laundered for UC-1 and CS-1. GUERRERO and GOMEZ delivered approximately 665 million Colombian pesos, representing the funds that GUERRERO, GOMEZ, and COVELLI laundered from the United States to Colombia that UC-1 "represented" to be drug money. The money was delivered, in cash, in a blue carry-on piece of luggage. During the same recorded meeting, GUERRERO also again told UC-1 that they had "furniture" (cocaine) available for purchase in Mexico City which wire intercepts revealed that the person in control of the cocaine was "la Erre" (RIGOBERTO MURIEL TORRES). Specifically, GUERRERO told UC-1 that the organization had smuggled 2,000 kilograms of cocaine into Mexico for importation into the United States, but that 700 kilograms were somehow lost (or seized) which led to some disagreement or problem regarding the shipment. GUERRERO said that the cocaine could be sold, with no money down, at a price of $13,000 per kilogram, in order to get the cocaine out of Mexico City and into the United States (out of concern that if the cocaine was stationary for too long, it could be seized or stolen).

## VI. LEGAL AUTHORITY

175.    Based on the information described above and on my training and experience, I have probable cause to believe that the target accounts are subject to seizure and forfeiture pursuant to the following:

(a)    The target accounts and the funds contained in them as described in Attachment A have been used, and are currently being used, to launder monetary instruments, domestically and internationally, and to conduct and attempt to conduct financial and monetary transactions in

violation of one or more of the following:

(i)   18 U.S.C. § 1956(a)(1)(A)(i) (laundering to promote specified unlawful activity);

(ii)   18 U.S.C. § 1956(a)(1)(B)(i) (laundering designed to conceal);

(iii)   18 U.S.C. § 1956(a)(2)(A) (international laundering to promote specified unlawful activity);

(iv)   18 U.S.C. § 1956(a)(2)(B)(i) (international laundering designed to conceal);

(v)   1956(a)(3)(B) (the "sting" laundering provision);

(vi)   18 U.S.C. § 1957 (unlawful monetary transactions over $10,000); and

(vii)   18 U.S.C. § 1956(h) (money laundering conspiracy).

Therefore, the target accounts, and the funds contained in them as described in Attachment A, constitute property, real or personal, involved in a transaction or attempted transaction in violation of Sections 1956 and 1957, or property traceable to such property and are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1) and/or 18 U.S.C. § 982(a)(1);

(b)   The target accounts contain, and have contained, funds as described in Attachment A that constitute or are derived from proceeds traceable to offenses constituting "specified unlawful activity," as defined in 18 U.S.C. § 1956(c)(7), incorporating 18 U.S.C. § 1961(1), including the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance, punishable under any law of the United States, and conspiracies to commit such offenses.  All such property, real or personal, which constitutes or is derived from proceeds traceable to such violations are forfeitable to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); and

(c)     The target accounts contain, and have contained, funds as described in Attachment A that constitute moneys, negotiable instruments, securities, and other things of value furnished or intended to be furnished by any person in exchange for a controlled substance in violation of the Controlled Substances Act, or proceeds traceable to such an exchange or moneys, negotiable instruments, and securities used or intended to be used to facilitate violations of the Controlled Substances Act.  Therefore, the funds in the target accounts as described in Attachment A are forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6) and/or 21 U.S.C. § 853(a).

176.     As detailed above, the total amount of the funds the government seeks to seize varies from account to account.  For those accounts for which the government has evidence that the account is used as part of an ongoing system, utilized by a network of co-conspirators, to launder drug money from the United States to Venezuela and Colombia, it seeks seizure of all funds in the account which includes drug proceeds laundered into the account as well as any otherwise legitimate funds commingled with, and used to conceal, the illegitimate funds going into the account.  These accounts include the Panama target accounts and other domestic accounts that involved account holders identified by the co-conspirators as "persons of confidence" or that involved wire transfers between and among other identified target accounts that do not appear to be based upon any legitimate business purpose.  All funds in these accounts constitute property involved in the money laundering violations, or property traceable thereto, and are forfeitable to the United States pursuant to 18 U.S.C. §§ 981(a)(1)(A), 982(a)(1).  Further, based upon the on-going use of these accounts for laundering activity, the United States requests that the seizure of these accounts include all funds deposited into the accounts for a period of 10 days after seizure of the account.

- 84 -

177.    As to the remaining target accounts, the United States seeks seizure and forfeiture of only the amount of proceeds laundered into the accounts.  Although entitled to seek forfeiture of the entire account, as property involved in money laundering, as to these accounts the government seeks seizure of only the amount of drug proceeds laundered into the specific account, and does not seek seizure of funds deposited after seizure of account.

the service of the seizure warrants.

178.    To the extent that any of the listed offenses were completed within one year before the seizure sought by this application, it shall not be a defense to forfeiture that the funds currently deposited in the target accounts are not the same funds that were involved in those completed offenses.  Pursuant to 18 U.S.C. § 984, the funds currently on deposit in the target accounts as described in Attachment A are forfeitable to the United States as fungible property in lieu of the funds that were so involved.

**B.      Jurisdiction to Issue Warrants to Seize Property Outside Massachusetts**

179.    Title 18, United States Code, Sections 981(b)(1) and (2) authorize seizure of property subject to civil forfeiture pursuant to warrants obtained under the Federal Rules of Criminal Procedure.  Section 981(b)(3) further provides, explicitly, that:

> Notwithstanding the provisions of rule 41(a) of the Federal Rules of Criminal Procedure, a seizure warrant may be issued pursuant to this subsection by a judicial officer in any district in which a forfeiture action against the property may be filed under section 1355(b) of Title 28, and may be executed in any district in which the property is found, or transmitted to the central authority of any foreign state for service in accordance with any treaty or other international agreement.

180.    Title 28, United States Code, Section 1355(b)(1)(A) provides that a forfeiture action or proceeding may be brought in any district "in which any of the acts or omissions giving

rise to the forfeiture occurred." Acts giving rise to the forfeitures alleged in this affidavit occurred in Massachusetts including, among other things, most of the telephone, email, and Internet communications, and many of the wire transmissions of actual and purported drug proceeds from Massachusetts banks to the target accounts pursuant to directions provided the drug operation conspirators.  It is well established that conspiracies and other "continuing offenses" may be charged in any district in which any act in furtherance takes place.  Title 18, United States Code, Section 1956(i) provides that money laundering transactions involving transfers of money from one place to another by wire or any other means are "single, continuing transaction[s]" and may be charged in any district in which any portion of the transfer transaction is conducted, incorporating section 1956(c)(2), which provides that "conducts" includes initiating, concluding, and participating in initiating and concluding the transaction.

181.    Accordingly, because acts that are bases for the forfeitures alleged in this affidavit occurred in Massachusetts, this Court has jurisdiction to issue seizure warrants for the forfeitable property located outside of Massachusetts, including property located in Panama.

## VII.   CONCLUSION

182.   Based on the facts, circumstances, and legal authorities set forth above, I believe there is probable cause to believe that the funds on deposit in the target accounts as described herein and in **Attachment A** hereto are subject to seizure and forfeiture to the United States of America.

SA Brian DeJoy
U.S. Drug Enforcement Administration

Sworn to and subscribed before me this  27th day of May, 2011.

U.S. MAGISTRATE JUDGE
DISTRICT OF MASSACHUSETTS